**Tomas Raul GALLO, Appellant,**

v.

**The STATE of Texas.**

**No. AP–74900.**

Court of Criminal Appeals of Texas.

Sept. 26, 2007.

Rehearing Denied Nov. 21, 2007.

Robert Morrow, Spring, for Appellant.

Carmen Castillo Mitchell, Asst. D.A., Houston, Matthew Paul, State's Attorney, Austin, for State.

## OPINION

MEYERS, J., delivered the opinion of the Court, in which KELLER, P.J., and PRICE, JOHNSON, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined.

Appellant was convicted in February 2004, of the capital murder of an individual under six years of age. TEX. PENAL CODE § 19.03(a)(8).[1] Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071, § 2(g).[2] Direct appeal to this Court is automatic. Art. 37.071, § 2(h). After reviewing appellant's thirteen points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

---

1. Appellant was initially indicted and tried for the offense in 2002; however, a mistrial was granted on January 2, 2003, because of a disabled juror. Appellant was re-indicted on February 20, 2003.

2. Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal Procedure.

## ADMISSION OF PHOTOGRAPHS

In his fifth point of error, appellant claims that the trial court erred in admitting "numerous, repetitious, [and] gruesome" photographs of the dead three-year-old victim in violation of the Eighth and Fourteenth Amendments to the United States Constitution. He complains that "[t]he photographs of the deceased child are hideous" and their admission "created a very serious risk that the jury would be unable to put aside their natural emotional repulsion and disgust and make their guilt and/or sentencing decision in a rational manner." He asserts that the photographs were unfairly prejudicial, especially in light of the fact that "[t]here was ample other evidence to illustrate the facts in the instant case[,]" such as the medical examiner's report, which gave a very detailed description of the child's body. Without addressing the individual photographs, appellant generally complains about the admission of State's Exhibits 66–68, 70–79, 81–100, and 118–120.

The admissibility of a photograph is within the sound discretion of the trial judge. *Williams v. State*, 958 S.W.2d 186, 195 (Tex.Crim.App.1997). Generally, a photograph is admissible if verbal testimony as to matters depicted in the photographs is also admissible. *Id.; Long v. State*, 823 S.W.2d 259, 271–72 (Tex.Crim. App.1991). In other words, if verbal testimony is relevant, photographs of the same are also relevant. Texas Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." A visual image of the injuries appellant inflicted on the victim is evidence that is relevant to the jury's determination. The fact that the jury also heard testimony regarding the injuries depicted does not reduce the relevance of the visual depiction.

Rule 403, on the other hand, allows for the exclusion of otherwise relevant evidence when its probative value "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Williams*, 958 S.W.2d at 196. A court may consider several factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. These factors include, but are not limited to: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, and whether the body depicted is naked or clothed. *Id.* The availability of other means of proof and the circumstances unique to each individual case must also be considered. *Id.*

Appellant filed a pre-trial "Motion to Suppress Gruesome Photographs." At the beginning of the motion, appellant generally and globally moved the trial court "to exclude all gruesome photographs of the victim." In the body of the motion, appellant generally set out the rule of relevance and the balancing test of Rule 403. However, in arguing that these rules should be applied to exclude the photographs in the instant case, appellant specifically referred only to the "[m]edical [e]xaminer's photographs."

State's Exhibits 118, 119, and 120 are all photographs of the victim as she appeared at the hospital. When the State offered these photographs into evidence, appellant stated, "No objections other than

previously lodged[,]" apparently referring to the pre-trial motion to suppress that was filed. "Being no objection," the court admitted the photographs. Because appellant's pre-trial motion only specifically referred to the medical examiner's photographs, appellant's reference to "objections . . . previously lodged" was not sufficiently specific to preserve any error regarding these three exhibits. *See* Tex.R.App. P. 33.1. Notwithstanding this, we note that all three photographs show no more than the injuries that the victim suffered shortly before her death at a time when appellant was the only adult with her. *See Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex. Crim.App.1992). The trial court did not abuse its discretion in admitting these photographs.

The remaining complained-of photographs were all taken during the medical examiner's investigation. State's Exhibits 66–68, 70–79, and 81–90 were identified by Chief Medical Examiner Dr. Luis Sanchez, who testified that he had reviewed 290 photographs and 61 glass slides before selecting these twenty-three photographs to illustrate the results of the external examination of the body and the external injuries the victim suffered shortly before her death. All twenty-three of the color photographs are 3 ½″ × 5″ in size and show the unclothed victim lying on the medical examiner's table. The photographs were taken from different angles and show various views of the over 200 contusions and lacerations the victim suffered in the last hours of her life. The photographs are no more gruesome than would be expected in this sort of crime. *See Narvaiz*, 840 S.W.2d at 429.

State's Exhibits 91–99 are also 3 ½″ × 5″ color photographs and are more gruesome than the other photographs because they all show injuries discovered during the internal examination of the victim's body.

Specifically, State's Exhibits 91 and 92 show close-up views of the cracked ribs the victim suffered shortly before her death. In Exhibit 91, the rib has been removed from the body. State's Exhibits 93–99 show various views of the underside of the victim's scalp, the victim's skull, and one picture of the victim's brain. The medical examiner used the photographs to show the massive amount of damage that was inflicted on the victim before her death, including a twelve-inch fracture that began at the base of her skull where the bone is thick. More specifically, the witness used the photographs to show the injuries that could not be seen on the surface of the body.

Although these photographs are gruesome, there was no danger that the jury would attribute the removal of the rib, scalp, or skull cap to the defendant. Further, the photographs were highly probative to show the full extent of the injuries appellant inflicted on the victim. *See Salazar v. State*, 38 S.W.3d 141, 147–53 (Tex. Crim.App.2001). Under the circumstances of this case, we cannot say that the trial court abused its discretion in deciding that the probative value of the photographs substantially outweighed the danger of unfair prejudice. *See id.*

◼ Finally, appellant complains that State's Exhibit 100 was more prejudicial than probative. State's Exhibit 100 is an 8 ½″ × 11″ piece of paper with a reproduction of State's Exhibit 79, a photograph showing damage to the victim's vagina, in a slightly larger format—that is, the original 3 ½″ × 5″ color picture has been reproduced as a 6 ¼″ × 6 ¾″ color image. That image is also somewhat overlapped by a 5 ¾″ × 4″ color picture depicting how a healthy child's intact vagina should appear. When this exhibit was introduced, State's Exhibit 79 had already been admitted into evidence. Further, this exhibit helped the

jury to understand the extent of the injuries that the victim suffered shortly before her death. Although the vaginal injuries were not the direct cause of death, the evidence suggested that appellant inflicted them during the same continuous transaction that resulted in her death. *See Rojas v. State*, 986 S.W.2d 241, 249–50 (Tex. Crim.App.1998) (autopsy photos of capital-murder victim showing injuries to her pelvic area, although not the cause of death, were "probative of appellant's mental state at the time of the murder, the specific circumstances of the murder, and the fact that appellant omitted some information from his statements to the police"). Evidence of the additional injuries was probative of appellant's mental state at the time of the murder and the specific circumstances of the murder. *See id.* Appellant has not shown that the prejudicial impact of this exhibit substantially outweighed its probative value. Because the trial court did not abuse its discretion in admitting any of the challenged photographs, point of error five is overruled.

## MOTION FOR CONTINUANCE

■ In point of error six, appellant argues that the trial court erroneously denied his motion for a continuance regarding the State's "surprise witness," Thomas Michael Gilstrap, who testified about statements appellant made to him while they were inmates at the Harris County Jail. Appellant asserts that he was denied effective assistance of counsel and due process because he was unable to properly investigate and cross-examine Gilstrap.

■ We review a trial court's ruling on a motion for continuance for abuse of discretion. *Janecka v. State*, 937 S.W.2d 456, 468 (Tex.Crim.App.1996). To estab-

lish an abuse of discretion, there must be a showing that the defendant was actually prejudiced by the denial of his motion. *Id.* A bare assertion that counsel did not have adequate time to interview the State's potential witness does not alone establish prejudice. *Heiselbetz v. State*, 906 S.W.2d 500, 512 (Tex.Crim.App.1995).

Gilstrap contacted the prosecutor on Thursday, February 5, 2004, a few days after the commencement of the State's case-in-chief. That same day, the prosecutor informed defense counsel that he intended to call Gilstrap as a witness. Defense counsel filed a motion for continuance on February 9, requesting more time to investigate Gilstrap's criminal and mental-health history. During a bench conference on the motion, the prosecutor stated Gilstrap called him on February 5, after Gilstrap saw defense counsel "on TV trying to blame the [victim's] mother." The prosecutor further stated that he was unaware of Gilstrap's existence prior to that time, that he immediately informed defense counsel about Gilstrap and the information he possessed, and that he provided defense counsel with Gilstrap's criminal history and jail records. Gilstrap testified in a hearing outside the presence of the jury that appellant admitted killing the victim and said he would "beat the case" because he failed an IQ test and was mentally retarded. Gilstrap also disclosed his own prior convictions and testified that he was currently on parole, had a prior parole violation for assaulting his wife, had a prior heroin problem, and had been sent to "M.H.M.R." while in jail because he was depressed. At the close of the hearing, the trial court overruled defense counsel's objection and decided "to allow the testimony." [3]

---

**3.** The order on appellant's motion for continuance in the clerk's record says that it was granted. However, this is not otherwise reflected in the record, and appellant did not receive a continuance.

Gilstrap testified before the jury that he contacted the District Attorney's Office after he saw media coverage of appellant's case on television. He acknowledged his prior convictions, parole status, substance-abuse problems, and the fact that he was depressed while in jail. He testified that appellant talked to him about the instant offense when they were housed in the Harris County Jail in January 2003. He testified that appellant stated, "I'm the one that killed that little girl." Appellant told Gilstrap that he was watching his girlfriend's daughter while she was at work, that the child was "bothering" him and "making a lot of noise," that he "spanked her four or five times," that she "quit breathing" after he "slammed her into the bathtub," and that he "got real scared," "tried to clean her up," and "called her mother at work." He also told Gilstrap that "he failed the IQ test" and "he'd probably beat the case because he was retarded."

Defense counsel cross-examined Gilstrap about the details of his assault on his wife, his "26 years of heroin abuse," the medications he was taking in the jail "psych ward," his cocaine abuse, his thirty-year criminal history, and the fact that he waited so long to come forward with information pertaining to appellant. Given trial counsel's extensive cross-examination, appellant has failed to show what surprise remained or in what manner counsel could have been more effective if he had been given more time to prepare for this witness. He has failed to show that he was actually prejudiced by the trial court's ruling. Point of error six is overruled.

### EXPERT WITNESS

In point of error seven, appellant asserts that the trial court erroneously excluded the expert testimony of Dr. George Holden "regarding the issue of filicide." He alleges that the trial court's ruling denied him a meaningful opportunity to present a complete defense.

Rule 702 of the Texas Rules of Evidence provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex.R. Evid. 702. The proponent of scientific evidence must show, by clear and convincing proof, that the evidence is sufficiently relevant and reliable to assist the jury in accurately understanding other evidence or in determining a fact in issue. *Nenno v. State*, 970 S.W.2d 549, 560–561 (Tex.Crim.App.1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex.Crim.App.1999). The reliability of "soft" science evidence may be established by showing that: (1) the field of expertise involved is a legitimate one; (2) the subject matter of the expert's testimony is within the scope of that field; and, (3) the expert's testimony properly relies upon or utilizes the principles involved in that field.[4] *Nenno*, 970 S.W.2d at 561. A trial court's ruling on the admissibility of the scientific expert testimony is reviewed under an abuse of discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App.2000).

The trial court held a hearing outside the presence of the jury on the admissibility of Holden's testimony. Holden testified that he was a college professor with a Ph.D. in developmental psychology and that he had "research expertise in the area of parent/child relationships and family vi-

---

**4.** "Soft" sciences include the social sciences or fields that are based primarily upon experi-ence and training as opposed to the scientific method. *Nenno*, 970 S.W.2d at 561.

olence." He explained that "filicide" is "what researchers call the phenomenon of parents that kill their children." He testified that "mothers are [statistically] more likely to kill their children than fathers" and that there are many "different motives or causes behind why parents may kill their children," including "when discipline goes ary [sic]." The trial court then asked defense counsel to clarify the proposed expert testimony:

> THE COURT: Can you tell me again what, I mean, just like maybe a couple of lines, sentences on what the focus of the testimony is suppose[d] to be in front of the jury[?]
>
> [DEFENSE COUNSEL #1]: The risk factors, which is where he's going now.
>
> THE COURT: Whose risk factor?
>
> [DEFENSE COUNSEL #1]: The general risk factors in filicides and then the risk factors of [the victim's mother] Cristina Arredondo.
>
> THE COURT: That puts the child at risk?
>
> [DEFENSE COUNSEL #1]: Her risk, what makes her a risk and potential suspect for the perpetration of the homicide.
>
> [DEFENSE COUNSEL #2]: As far as a profile goes, Judge, a profile for someone.
>
> [DEFENSE COUNSEL #1]: Risk factors.
>
> THE COURT: Thank you, that's what I was looking for.
>
> You are wanting to set up a profile for somebody that kills their own child?
>
> [DEFENSE COUNSEL #1]: Yes, ma'am.

Holden then explained that he reviewed Arredondo's "psychological report" and "C.P.S. records" and concluded that she had the following "risk factors that are certainly associated with physical child abuse": youth; limited income and education; the stress of having two young children; "personality attributes identified as antisocial and narcissistic, angry and capable of manipulative behavior"; "rigid child rearing attitudes" with the use of physical punishment; "evidence that [the victim] was a difficult, challenging child"; "a series of relationship problems with adult men"; and, being a victim of both physical and psychological domestic violence herself.

On cross-examination, Holden testified that "[t]he science of predicting one who is capable of killing is inexact" and "there hasn't been extensive enough research into the characteristics of filicide in order to come up with a set profile." At the conclusion of the hearing, the trial court ruled Holden's testimony inadmissible:

> THE COURT: I am not going to allow that testimony, in fact, for a couple of different reasons.
>
> No. 1, I think, sort of the last sentence out of the witness' mouth sort of sealed it, not extensive enough research for him to give any kind of risk factors as to the study of filicide, which the Court has questions as to whether that's a legitimate field of expertise and whether it would be helpful to the jury or not, so I am going to—I am not going to allow that testimony.
>
> * * *
>
> I don't find his testimony with regard to the studies of filicide or child abuse to be reliable[.]

Appellant did not show by clear and convincing proof that Holden's testimony was sufficiently relevant and reliable to assist the jury in accurately understanding other evidence or determining a fact in issue. The trial court did not abuse its

discretion in ruling the evidence inadmissible. The trial court's ruling did not prevent appellant from arguing that the victim's mother could have committed the crime. Point of error seven is overruled.

## JURY ARGUMENT

■ In his eighth point of error, appellant contends that the State "purposefully attacked appellant over the shoulders of defense counsel" during its closing argument at the guilt phase of the trial. Permissible jury argument falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement. *Cannady v. State,* 11 S.W.3d 205, 213 (Tex.Crim.App.2000). We have consistently held that argument that strikes at a defendant over the shoulders of defense counsel is improper. *Wilson v. State,* 7 S.W.3d 136, 147 (Tex.Crim.App. 1999); *Dinkins v. State,* 894 S.W.2d 330, 357 (Tex.Crim.App.1995).

Appellant complains about the following portion of the prosecutor's closing argument:

[PROSECUTOR]: This focus on Cristina and the 911 calls, I haven't got a clue what [defense counsel's] clue is about on that one. I mean, come on, the 911 numbers, a hang-up call, what does that tell you? He had a hypothesis like he does most of the time with Mr. Sanchez—Dr. Sanchez, that the 911 calls are land lines over here while the 20–minute gap is over here (indicating). Where in the hell is the evidence on that? There isn't any. It's his theory to run you down a rabbit trail so you'll lose focus of Tomas Gallo.

[DEFENSE COUNSEL]: We object to the prosecutor striking the defendant over counsel's shoulder.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Ask the jury be instructed to disregard.

THE COURT: Please disregard the last comment.

[DEFENSE COUNSEL]: We respectfully move for a mistrial.

THE COURT: Overruled.

■ Assuming, as the trial court did, that the prosecutor's comment was inappropriate, we next turn to the question of harm. We conduct a harm analysis using the following three-factor test: (1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and, (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Mosley v. State,* 983 S.W.2d 249, 259 (Tex.Crim.App. 1998).

In this case, curative action was taken because the trial judge instructed the jury to disregard the prosecutor's comments. The third factor also weighs in favor of the State due to the strength of its evidence, including appellant's own admissions and DNA evidence connecting him to the offense. Appellant was not harmed by the prosecutor's argument.

■ Appellant also argues that the trial court improperly denied his motion for a mistrial when the prosecutor used curse words twice during closing argument:

[PROSECUTOR]: ... Alexis didn't name anybody else as being present in that home when her sister was murdered, not a one. The only one mentioned was Tomas Gallo, the only name given.

It doesn't take a rocket scientist at that point to figure out who your suspect is, and it kind of helps when you've got

an idea who you are looking for and the son-of-a-bitch is running—

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Sustained.

[DEFENSE COUNSEL]: We ask for an instruction to disregard.

THE COURT: The jury will be instructed to disregard the last comment.

[DEFENSE COUNSEL]: And we respectfully ask for a mistrial.

THE COURT: Overruled.

[PROSECUTOR]: When he's the one running, hiding in a car two streets over and he's smoking marijuana and he's eating pizza . . .

\* \* \*

[PROSECUTOR]: . . . That baby was laying there, like he says, it was for that 20 minutes worth of phone calls. How did—why didn't he dial 911? Why didn't he dial 911? He didn't dial 911 because he is the killer. He's thinking, oh, shit, what have I done? What am I going to do now?

[DEFENSE COUNSEL]: I object again—

THE COURT: Sustained.

[DEFENSE COUNSEL]: I ask the jury be instructed to disregard.

THE COURT: [Prosecutor], please refrain—please use proper language.

[PROSECUTOR]: Yes, ma'am.

[DEFENSE COUNSEL]: We ask that a mistrial be granted.

THE COURT: Overruled.

Appellant's argument on appeal is that the prosecutor "subjected [him] to epitaphs unworthy of courtroom decorum and in violation of the United States Constitution." His general objection at trial does not comport with his argument on appeal. Further, he fails to explain on appeal exactly which of his federal constitutional rights were violated. This portion of his argument is not preserved and is inadequately briefed. TEX.R.APP. P. 33.1 and 38.1. Point of error eight is overruled.

## VOLUNTARINESS INSTRUCTION

In point of error four, appellant asserts that the trial court erroneously denied his requested instruction on the voluntariness of his statement:

You are instructed that no evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas or the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on trial of any criminal case.

You are instructed that the Constitution and laws of the State of Texas and of the United States provide that no written statement of an accused, made as a result of custodial interrogation, shall be admitted against him at a criminal trial unless the officer or person taking the statement has, prior to taking the statement, informed the suspect of his right to remain silent, including his right to terminate his participation even if he has begun to make a statement, and his right to counsel before and during the making of a statement, including his right to appointed counsel for the purpose of advising him at the time.

You are further instructed that the Constitution and the laws of Texas and the United States provide that if, after a person has received warnings of his constitutional rights and interrogation continues and a statement is obtained in the absence of an attorney, the State bears a heavy burden to prove that the defendant knowingly and intelligently waived his privilege against self incrimination and his right to appointed counsel.

You are instructed that Texas statutory law requires that a written statement may not be used against a defendant unless the face of the statement reflects that the accused, prior to and during the making of the statement, knowingly, intelligently and voluntarily waived the right to remain silent and the right to counsel.

Therefore, if you find or believe that Defendant's mental retardation or mental impairment prevented him from making an understanding waiver of his right to remain silent or his right to counsel, you will find that the statement was taken in violation of the Constitution or laws of Texas and/or the United States, and you will not consider the statement for any purpose against him.

Appellant specifically complains that the trial court should have instructed the jury to disregard his statement if they determined that his "mental retardation or impairment was such that he could not understand the *Miranda* [5] warnings." He claims he was deprived of his constitutional right to a fair trial as a result of the trial court's error.

▉▉▉▉ The trial court instructed the jury in compliance with Articles 38.21, 38.22, and 38.23. It would have been improper for the trial court to include the issue of mental retardation in its voluntariness instruction. *Penry v. State*, 903 S.W.2d 715, 748 (Tex.Crim.App.1995). An instruction that focuses on a particular factor that may render a statement involuntary is an impermissible comment on the weight of the evidence. *Id.; Rocha v. State*, 16 S.W.3d 1, 20 (Tex.Crim.App. 2000). Point of error four is overruled.

## MENTAL RETARDATION

▉▉▉▉ Appellant's first three points of error pertain to the issue of mental retardation. In *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the United States Supreme Court held that it is unconstitutional to execute one who is mentally retarded. The Court left to the individual states the job of establishing the substantive and procedural mechanisms to implement that holding. *Id.* In the three legislative sessions since *Atkins*, the Texas Legislature has not established a statutory scheme for the presentation and determination of an issue of mental retardation in a capital murder trial. In the absence of legislative action, this Court has formulated temporary judicial guidelines in addressing *Atkins* claims. *Ex parte Briseno*, 135 S.W.3d 1, 5 (Tex. Crim.App.2004). We define mental retardation as a disability characterized by: (1) "significantly subaverage" general intellectual functioning; (2) accompanied by "related" limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18. *Id.* at 7. Other evidentiary factors that factfinders in the criminal-trial context might also focus on in weighing evidence as indicative of mental retardation include:

Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?

Has the person formulated plans and carried them through or is his conduct impulsive?

Does his conduct show leadership or does it show that he is led around by others?

Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

---

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

Can the person hide facts or lie effectively in his own or others' interests?

Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Id.* at 8–9. Although a jury determined the issue of mental retardation in this case, it is important to note at the outset that a jury determination of mental retardation is not required. *See Schriro v. Smith*, 546 U.S. 6, 7, 126 S.Ct. 7, 163 L.Ed.2d 6 (2005)(holding that the Ninth Circuit erred in commanding Arizona courts to conduct a jury trial to resolve mental-retardation claim); *see also Briseno*, 135 S.W.3d at 9 (holding that *Atkins* does not require a jury determination of mental retardation in a post-conviction proceeding). With this overview, we now turn to appellant's points of error.

■■■ In his first point of error, appellant claims that the evidence is both legally and factually insufficient to support the jury's determination that he is not mentally retarded.[6] The question of whether appellant was mentally retarded was submitted to the jury as "Special Issue No. 2" in the punishment charge: "Do you find, taking into consideration all of the evidence, that the Defendant is a person with mental retardation?" The jury unanimously answered this special issue in the negative.

■■■ This Court held in *Briseno* that the mental retardation issue is like the affirmative defenses of insanity, incom-

petency to stand trial, and incompetency to be executed. 135 S.W.3d at 12. Thus, in a habeas action, a defendant has the burden to prove mental retardation by a preponderance of the evidence. *Id.* Similarly, we now hold that when the issue is presented at trial, a defendant bears the burden of proof, by a preponderance of the evidence, to establish that he is mentally retarded. In evaluating the sufficiency of the evidence to support a jury's determination that a defendant is not mentally retarded, we must consider all of the evidence relevant to the issue and evaluate whether "the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust." *See Meraz v. State*, 785 S.W.2d 146, 155 (Tex.Crim.App.1990)(conducting a factual-sufficiency review of affirmative defense of insanity); *see also Bigby v. State*, 892 S.W.2d 864, 875 (Tex.Crim.App.1994)(also conducting factual-sufficiency review of insanity affirmative defense), and *Watson v. State*, 204 S.W.3d 404, 437 (Tex.Crim.App.2006)(Cochran, J., concurring)(stating we should continue to follow the *Meraz/Bigby* standard of review when the proponent bears the burden of proof by a preponderance of the evidence).

The expert witness for the defense was Dr. Richard Garnett, a psychologist in private practice with thirty-five years of experience in the field of mental retardation.[7] Garnett did not administer any IQ or adaptive behavior tests to appellant, but he interviewed him personally at the Harris County Jail in 2002. During the interview, appellant was "very talkative" and "interactive," but "at times [Garnett] couldn't quite follow what he was saying." In addition to interviewing appellant, Garnett also

---

6. Although appellant's first point of error is multifarious, we will review his arguments in the interest of justice.

7. Garnett testified at the guilt phase of the trial. At punishment, defense counsel stated he "would reoffer the evidence [he] offered during the guilt phase."

reviewed his school records, his criminal-justice records, the transcript of an interview with his mother, and the results of the 2002 psychiatric evaluation of appellant conducted by the State's expert.

Appellant attended school in the Palo Verde Unified School District in California from 1980 to 1993. Garnett testified that appellant's school records consistently showed a lack of achievement and a pattern of performing well below his grade level. When appellant took the "Iowa Test of Basic Skills" in 1984, at age eight, his overall score was in the "low five percentile," although his vocabulary score was "considerably higher." At age nine, his scores "were still at pretty low levels," including many scores in the first and second percentile, which "reflected that there had been very little learning over the year." At age twelve, "he had peaks and valleys that ranged from the first percentile to the 22nd percentile, but 11 of those 15 subscales were still at or below the six percentile." Appellant was moved into "special resource" or "special education" classes when he was "around 13." He was later placed into a program called "Second Chance," which was "an alternative to juvenile detention."

At age 14, appellant achieved a full-scale IQ score of 74 on the Wechsler Intelligence Scale for Children–Revised exam (WISC–R).[8] Garnett testified that the "standard error of measurement" for Wechsler test is "five points above and below" and that "95 times out of a hundred the score is going to be in that range."[9]

Appellant obtained a full-scale score of 71 on an "Adolescent Behavior Inventory," which measured his adaptive behavior, and Garnett testified that this score "would fall in the same kind of range as the IQ would be." Appellant received a standard score of 60 and a cognitive development score of 61 on the "Personality Inventory for Children," and Garnett testified that these scores are "not the same as the IQ scores."

In 1991, when appellant was in the eleventh grade, he was reading at the fifth-grade level, "math was 3.9," and "spelling was 5.4." In 1992, at age seventeen, all of his basic skills test scores "were at or below the 5th grade level of achievement." His 1992 scores on the "Wide Range Achievement Test" and the "Woodcock Johnson" test showed that he was at or below the sixth-grade level in spelling, math, and reading. His school records stated at that time that he was still eligible for special education. Appellant stopped attending school in 1993.

Garnett testified that appellant had an IQ score that was two standard deviations below average, limitations in at least two areas of adaptive behavior, and evident signs of mental retardation before the age of eighteen. Thus, he concluded that appellant was mentally retarded.

Defense witness Melinda Bates testified at punishment that she was appellant's teacher when he was in the tenth grade. She taught him in a "resource class" for children with "learning disabilities" or "cognitive problems." Appellant read at a third-grade level in tenth grade. He had

---

8. The phonetic spelling of "Wechsler" is used in the statement of facts. Garnett testified that "[t]hey administered the Wexler Intelligence Scale for Children, the revised edition" and that the State's expert, Dr. George Carl Denkowski, "did a complete Wexler evaluation." We will assume this means that appellant took the WISC–R at age 14 and that Denkowski administered a version of the Wechsler Adult Intelligence Scale (WAIS) at age 27.

9. The American Psychiatric Association definition of mental retardation quoted in *Atkins* states that "mild" mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70.

"cognitive delays" and "struggled with school" despite the fact that resource classes "were adapted specifically for students who have low skills." Although appellant was suspended and later expelled for misconduct in school, he was polite, respectful, and obedient in her class. Bates explained that the school system used the term "limited cognitive functioning" instead of "mentally retarded." She further explained that students in resource classes were graded on the basis of their effort and motivation, which was "totally different" than in a mainstream class.

Defense witness Charlene Gallo, appellant's mother, testified at punishment about appellant's behavior as a child. She had to constantly repeat things to him before he would understand them. He often looked at her "in a blank way" and pretended to understand her. He could not perform simple tasks like taking out the trash, gluing wings on a model airplane, following a grocery list, making change, using a map or globe, reading a clock with numbers, or fixing things around the house. He did not learn the alphabet until he was in fifth or sixth grade and had trouble tying his shoes. It was difficult for him to navigate his neighborhood, and he used landmarks instead of street signs to get around. He had to take his driver's test orally because he could not read it.

On cross-examination, Gallo acknowledged that she consistently described appellant as "above average" when she was interviewed by school and juvenile authorities in the past. She also described appellant as a "leader" when he was in Little League. She testified that he had friends and that he started going to school and doing more chores around the house after

he was first arrested as a teenager. She further testified that appellant worked in fast food restaurants as a teenager and that as an adult he was able to find work and live on his own.

The State's expert witness was Dr. George Carl Denkowski, a clinical psychologist who reviewed appellant's records, interviewed four of his former high-school teachers and his former probation officer, and personally evaluated him.[10] Appellant obtained a full-scale IQ score of 68 when Denkowski tested him at age 27 in 2002. Denkowski also tested appellant's depression and anxiety levels using the "Beck Depression Inventory" and the "Beck Anxiety Inventory." Appellant's scores indicated that he was "seriously depressed and moderately anxious." Denkowski testified that people who are seriously depressed "tend to produce IQ scores that are about eight points lower." He testified that appellant's "lack of achievement, motivation, [and] his disinclination to apply himself in school would have contributed somewhat to lowering his IQ score." He believed that appellant's IQ was above 70, after taking into account his previous IQ score and the evidence of his depression and anxiety.

Denkowski testified that appellant had a lack of motivation rather than a lack of ability. Appellant's scores on the "Iowa Test of Basic Skills" during his school years showed that "he has adequate learning ability when he's motivated to apply it." Denkowski also pointed out that appellant's grades and achievement scores tended to increase after he got into trouble as a juvenile and after his mother placed him into foster care.

10. The State's witnesses who testified regarding mental retardation did so at the guilt phase (except for Susan Distal, who testified

at both phases of trial). At punishment, the State "reoffer[ed] all the evidence from the case in chief."

Denkowski testified that when appellant's mother previously answered questions about him on the "Personality Inventory for Children," she rated him above average in general achievement, development, social skills, general adjustment, cognitive development, and intelligence. Denkowski acknowledged that parents sometimes overstate the skills of their children, however, "the rating was so high on these skills ... that even when you discounted for that tendency it showed that in her mind he functioned just as well as any other child." She also reported that appellant had depression, anxiety, and an "extremely high" level of delinquency in high school. Denkowski adjusted appellant's "Adolescent Behavior Inventory" score to 85 because the test had "bad norms" and "compared [appellant] to kids that were much older than he was."

Appellant told Denkowski that he had worked for "Hydroblast" in Houston, using high-pressure hoses to wash the inside of reactor tanks. He worked on scaffolds in confined spaces, wore a respirator, and "had to learn how to get extra oxygen in case something blew up." He was required to pass tests on safety procedures and the proper use of high pressure equipment. If he did not pass a test the first time, then he used a "problem solving strategy" and "would remember pictures and words and numbers so that when he retook the test he would pass it." Denkowski testified that mentally retarded people in general are "highly deficient in that sort of strategy."

Denkowski also tested appellant's adaptive behavior in 2002. Denkowski's "2002 Adaptive Behavior Assessment System Data," which is contained in State's

Exhibit 145, states that appellant had an "adaptive composite" scaled score of 71 and a "scaled score range" of 69 to 77. Denkowski testified that appellant had "a high level of adaptive behavior in the environment he lived in," as evidenced by his "chronic drug selling," "ability to mediate gang conflicts," and "ability to maintain employment." Denkowski testified that appellant was deficient in "functional academics," but explained that "[k]ids that have initial behavior problems in initial grades fall behind and never catch up." [11] Denkowski also found that appellant was deficient in "health and safety," but reasoned that most people with a delinquent background "don't worry too much about health and safety" and do not learn those skills because "it's just unimportant to them." Denkowski concluded that appellant was not mentally retarded.

High school teacher James Smallwood testified that appellant was a student in his culinary-skills class during his senior year. Appellant was in the "Restaurant Division," which served lunch to teachers. Appellant performed all of the jobs in the class, ranging from dishwasher to short-order cook. Appellant "did not like the front of the house," or "public area," but he excelled at being a short-order cook, which involved "a lot of timing" and "thinking skills." Smallwood testified that appellant had good communication skills and was good at dealing with and leading people. Smallwood also enlisted appellant's help in his attempt to deal with gang problems and create a "safe zone" at the high school.

Susan Distal testified that she was appellant's juvenile-probation officer from 1991 to 1993. She had frequent contact

---

**11.** Under the American Association of Mental Retardation (AAMR) definition quoted in *Atkins,* "adaptive skill areas" include the following: communication; self-care; home living; social skills; community use; self-direction; health and safety; functional academics; leisure; and, work. 536 U.S. at 308 n. 3, 122 S.Ct. 2242.

with appellant and never suspected that he was mentally retarded. She met with teachers and family members and there were never any discussions about mental retardation. Appellant never appeared to have any problems understanding her questions or following their conversations. Appellant seemed to lack motivation in school at times. Distal testified, "He would bring in his report card and when he was willing and ready to do the work and motivated to do it his grades would go up. When he wasn't they would go down." Appellant was confined in a juvenile facility for about sixty-two days as part of his probation. Officials at the facility never referred him to be evaluated for mental retardation.

In summary, this case involves dueling experts and evidence both in favor of and against a finding of mental retardation. Appellant's IQ score was above 70 prior to the age of 18 and below 70 at the age of 27. Denkowski explained that appellant's lack of motivation, serious depression, and moderate anxiety served to lower his score. In school, appellant was in resource classes and had achievement scores that were below his grade level. Denkowski theorized that appellant's poor academics were due to a lack of motivation rather than a lack of ability. Appellant excelled as a short-order cook in his high school culinary class, a multi-tasked job that required thinking and timing skills. One high school teacher described him as a leader and a good communicator, while another testified that he struggled in her resource class. The evidence also showed that appellant worked in fast food restaurants, passed safety and procedure tests for his job at Hydroblast, had friends and relationships with women, was involved in a gang, and sold drugs. The jury was ultimately in the best position to make credibility determinations and evaluate this conflicting evidence. *Briseno,* 135

S.W.3d at 9; *Hall v. State,* 160 S.W.3d 24, 40 (Tex.Crim.App.2004), *cert. denied,* 545 U.S. 1141, 125 S.Ct. 2962, 162 L.Ed.2d 891 (2005).

The *Briseno* factors in this case lend further support to the jury's determination. Although appellant was in resource classes in school, his mother and his juvenile probation officer did not think that he was mentally retarded during his developmental phase. His mother and his high school culinary-class teacher both stated that he had leadership skills. Garnett and appellant's mother noted some communication problems, but the State's witnesses all described appellant as a good communicator who had no trouble understanding and answering their questions. Although appellant's commission of the instant offense may have been impulsive, his subsequent conduct showed his ability to lie in his own interest. After he killed the victim, he cleaned the blood and feces from her body and changed her clothes. He called the victim's mother at work and said that the victim was not breathing and he did not know what was wrong with her. He reminded the victim's mother that he had a warrant out for his arrest for a parole violation and fled the scene before police arrived. He said in his statement to police that he observed the victim "having problems breathing" after he awoke from a nap, that she defecated on herself when he was trying to resuscitate her, and that he cleaned her with toilet paper and put water on her head and face to wake her. The victim's bloody nightgown was later found under the water heater in the garage. While in the county jail awaiting trial, appellant admitted to a fellow inmate that he beat the victim to death and "tried to clean her up," adding that "he failed the IQ test" and "he'd probably beat the case because he was retarded."

The evidence was sufficient to support the jury's determination that appellant failed to prove mental retardation. The judgment was not so against the great weight and preponderance of the evidence so as to be manifestly unjust. *Meraz,* 785 S.W.2d at 155. Point of error one is overruled.

In point of error two, appellant claims that the trial court erred in denying his motion for mistrial and his motion for continuance when *Briseno* "was handed down in the midst of trial." He asserts that "[t]he defense needed time to study *Briseno* and also the effect it would have on their presentation of evidence in the instant case." We review a trial court's denials of motions for mistrial and continuance under an abuse of discretion standard. *Simpson v. State,* 119 S.W.3d 262, 272 (Tex.Crim.App.2003); *Heiselbetz,* 906 S.W.2d at 511.

This Court published the *Briseno* opinion on Wednesday, February 11, 2004. Defense counsel moved for a mistrial on Thursday, February 12, after both sides rested and before closing arguments at the guilt phase. Defense counsel argued as follows:

[The] A.A.M.R. had a definition that involved IQ score and adaptive behavior functioning and onset before the age of 18. We geared our defense for meeting that challenge. We obviously have raised the retardation debate, but more importantly we intend to raise it at punishment with that rule in place, with that goal in mind to try to meet the existing case law as we understood it up until yesterday.

And what the Court has done now, which we certainly, with all due respect, you know, we'll challenge the underlying premise of *Briseno,* which is that Texas may in some way subvert the Eighth Amendment protections of *Atkins* by coming up with some sort of citizen-sponsored standard that you have to meet to be in Texas retarded. And I think that just completely subverts the whole idea of *Atkins* and ultimately, I hope, would result in a finding that the Eight[h] Amendment would be violated by such a process.

But in any event, with all due respect to the Court, we now have a new way of trying these cases which we are surprised by and which will be to the detriment of our client if we're forced to go forward.

I told the Court in chambers that we're prepared to defend against the definition we had of the adaptive behavior scales which had been argued back and forth between the experts. We chose not to bring civilian witnesses to banter back and forth on the [minutia] of the adaptive behavior when we had what we thought was strong expert testimony.

The Court now, in Judge Cochran's opinion stands that strategy on it's [sic] head and says that's not going to get the job done. Had I known that before yesterday, I would have done this: Prepared this case differently, and I would be prepared to go forward with the emphasis on lay witnesses. As I read *Briseno,* she concedes or argues that there's going to be experts, we take that for granted, each side will employ someone to carry their argument forward. But the real battle will come in the lay witness category and in our opinion she elevates that lay witness battle over adaptive behavior, you know, in violation of the Eighth Amendment. But in my opinion it doesn't count, her's [sic] does, and I would have done things differently had I had access to this before yesterday.

So for all these reasons, Your Honor, we would respectfully move for a mistrial.

The State responded that *Briseno* placed the burden of proof on the defense but did not change the definition of mental retardation, and the trial court denied appellant's motion for mistrial. Defense counsel then asked ,for additional time to "try to gauge our strategy and address this with more emphasis on the lay witnesses and adaptive behavior," and the trial court stated it would "reconsider the request in terms of punishment."

Defense counsel filed a written motion for continuance on Tuesday, February 17, after the State rested on punishment but before the presentation of appellant's punishment evidence. Defense counsel argued that he had originally intended to rely only on expert-witness testimony regarding adaptive behavior, but that *Briseno* "elevated the lay witnesses on adaptive behavior far beyond what the law permitted before that time and made their opinion the most crucial one in a determination of whether someone is retarded or not." The defense investigator traveled "back to California to reinvestigate the lay witnesses" on "President's Day weekend," leaving on Friday, February 13, and returning on Monday, February 16. Defense counsel explained that the investigator was "able to locate one witness," that "[t]wo others that we were able to locate could not come back," and "a bunch of people we wanted to talk to just weren't there because of the holiday." Defense counsel stated in the written motion that more time was needed to subpoena "two lay witnesses," Lelo Solario and Jose Solario. Defense counsel explained that their testimony was "crucial" because "[b]oth have stated that they have known

Defendant since the 'developmental period' (before he was 18) and both have observed significant adaptive deficits in Defendant's everyday life; both had and have, the opinion that he is mentally slow and does not function on an ordinary level of intelligence and life skills." The trial court ruled as follows:

I think, as it turned out, there was an extra day. I had planned on giving you an extra day, but the Court was actually sick one day, so there was one extra day. I think you indicated you sent somebody to California to try to find some people. Obviously that's not a lengthy continuance. You were actually given a day to try to find some additional people, and so your request for continuance will be deny [sic].

The Court later clarified that the "Motion for Continuance was granted for one day," but that additional time was denied.[12]

■■■ Appellant complained at trial that he was unable to properly present his mental-retardation claim because *Briseno* changed the AAMR definition of mental retardation by assigning "superior status" to "lay witness testimony" on adaptive behavior. This characterization is inaccurate. In *Briseno*, we specifically stated that we will follow the criteria set out by the AAMR and the Texas Health and Safety Code until the Texas Legislature provides an alternate statutory definition of mental retardation applicable to death penalty cases. 135 S.W.3d at 8. Recognizing that the adaptive-behavior criteria are "exceedingly subjective," we set out some additional factors that factfinders *might* also focus upon in weighing evidence as indicative of mental retardation. *Id.* Although these factors incorporate lay-witness testimony, they do not exclude

---

12. The trial court's order on appellant's motion for continuance shows that it was denied, but also notes: "ct. did give one day (Friday 2–13–04)."

or downplay the importance of expert testimony or other evidence. In fact, we stated that "experts may offer insightful opinions on the question of whether a particular person meets the psychological diagnostic criteria for mental retardation." *Id.* at 9. Further, many of the *Briseno* factors pertain to the facts of the offense and the defendant's behavior before and after the commission of the offense. The ultimate issue of whether a defendant is mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact, based upon *all* of the evidence and determinations of credibility. *Id.*

Appellant has not shown that he was prejudiced by the trial court's rulings. *See Simpson,* 119 S.W.3d at 272 (stating mistrial is appropriate for only "highly prejudicial and incurable errors"); *see also Heiselbetz,* 906 S.W.2d at 511 (requiring defendant to show specific prejudice to his defense to establish that there was an abuse of discretion in denying a continuance). At punishment, appellant presented the adaptive behavior testimony of witnesses who knew him best during the developmental phase, including his mother and his tenth-grade resource teacher. *Briseno,* 135 S.W.3d at 8. Although he mentioned two additional "lay witnesses," Lelo and Jose Solario, in his motion for continuance, he fails to discuss them at all on appeal. The trial court did not abuse its discretion in denying appellant's motion for mistrial or motion for continuance. The trial court's rulings were within the zone of reasonable disagreement. *Heiselbetz,* 906 S.W.2d at 517; *Wead v. State,* 129 S.W.3d 126, 129 (Tex.Crim.App. 2004). Point of error two is overruled.

■ In point of error three, appellant argues that the trial court erroneously rejected his proposed instructions regarding mental retardation. Appellant filed a motion entitled "Defendant's Requested Charge—Mental Retardation" and requested that the mental retardation special issue state as follows:

Tomas Gallo, the Defendant, has offered evidence that he is significantly limited in his reasoning, social and practical skills. The Defendant contends that this impairment began before the age of 18, and it includes significantly sub-average intellectual functioning, and limitations in coping with the generally recognized standards of personal independence and social responsibility. If such an impairment is shown, it is called mental retardation.

Has the State proven to you, beyond a reasonable doubt, that the Defendant does not have such a mental impairment?

The trial court denied appellant's request. Appellant also filed a motion entitled "Defendant's Alternative Requested Charges—Mental Retardation," and requested the following definitions, in order of preference:

(a) Tomas Gallo, the Defendant, has offered evidence that he has a mental impairment called mental retardation. A person with mental retardation is a person with significantly sub-average general intellectual functioning. He is limited in the effectiveness with which he can carry at least one of the requirements of everyday life, e.g. communication, self-direction, self-care, health and safety, social skills, community use, functional academics, home living, leisure, and work. Mental retardation begins before the age of 18;

(b) Tomas Gallo, the Defendant, has offered evidence that he has a mental impairment called mental retardation. A person with mental retardation is a person with significantly sub-average

general intellectual functioning. He is limited in the effectiveness with which he can carry out two or more of the requirements of everyday life, e.g. communication, self-direction, self-care, health and safety, social skills, community use, functional academics, home living, leisure, and work. Mental retardation begins before the age of 18;

(c) The jury is to decide if Tomas Gallo, the defendant, has raised an issue of mental retardation. A person with mental retardation is a person with significantly sub-average general intellectual functioning. He is limited in the effectiveness with which he can carry out two or more of the requirements of everyday life, e.g. communication, self-direction, self-care, health and safety, social skills, community use, functional academics, home living, leisure, and work. Mental retardation begins before the age of 18.

The trial court denied appellant's requested definitions and instead instructed the jury as follows:

With respect to the second Special Issue, you are instructed that "mental retardation" means significantly sub-average general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period, onset prior to the age of 18.

"Adaptive behavior" means the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group.

"Sub-average general intellectual functioning" refers to measured intelligence on standardized psychometric instruments of two or more standard deviations below the age group mean for the tests used.

* * *

*SPECIAL ISSUE NO. 2*

Do you find, taking into consideration all of the evidence, that the Defendant is a person with mental retardation?

Appellant contends that the trial court should have instructed the jury that the State had the burden of proving that appellant was not mentally retarded, because Article 37.017, § 2(c), provides that the State must prove all of the punishment special issues beyond a reasonable doubt. Appellant further complains that "[t]he instruction given is arcane and almost incomprehensible." We specifically stated in *Briseno* that the defendant bears the burden of proof, by a preponderance of the evidence, to establish that he is mentally retarded. 135 S.W.3d at 12. The trial court's instructions contain the exact definitions of "mental retardation," "adaptive behavior," and "subaverage general intellectual functioning" from section 591.003 of the Texas Health and Safety Code, with the additional phrase "onset prior to the age of 18" from the AAMR definition. In *Briseno,* we endorsed the use of the AAMR and Texas Health and Safety Code definitions until the Texas Legislature provides an alternate statutory definition of "mental retardation" for use in capital sentencing. *Id.* at 7–8. The trial court did not err in refusing appellant's instructions. Point of error three is overruled.

### IMPACT OF EXECUTION

In point of error nine, appellant argues that the trial court erroneously excluded evidence of the impact his execution would have on his family and friends, in violation of his Eighth Amendment right to present mitigating evidence. We have previously rejected this argument. *Holberg v. State,* 38 S.W.3d 137, 141 (Tex.Crim.App.2000); *McFarland,* 928 S.W.2d at 522; *Fuller v. State,* 827 S.W.2d 919, 935–36 (Tex.Crim.

App.1992). This type of evidence is objectionable because it does not pertain to appellant's background, character, or record, or the circumstances of the offense. *Fuller,* 827 S.W.2d at 935–36. Appellant cites *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), in support of his argument, but this evidence does not fall within the scope of *Payne. Jackson v. Dretke,* 450 F.3d 614, 618 (5th Cir.2006), *cert. denied,* — U.S. ——, 127 S.Ct. 935, 166 L.Ed.2d 717 (2007). Point of error nine is overruled.

## RESIDUAL DOUBT INSTRUCTION

In his tenth point of error, appellant asserts that the trial court "erred in denying [his] request for an instruction allowing the jurors to consider any residual doubt as a mitigating circumstance when answering the mitigation special issue and the continuing threat special issue." He alleges that he was deprived of "his right to lace all mitigating evidence, including the 'circumstances of the offense' within the jury's effective reach," in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

■■■ There is no constitutional right to have jurors' residual doubts about the defendant's guilt be considered as a mitigating factor during deliberations in a capital murder case. *Franklin v. Lynaugh,* 487 U.S. 164, 174, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988); *Blue v. State,* 125 S.W.3d 491, 502 (Tex.Crim.App.2003). Further, there is no constitutional right to a jury instruction regarding residual doubt. *Franklin,* 487 U.S. at 174–175, 108 S.Ct. 2320. Point of error ten is overruled.

## CLOSING ARGUMENT ON MITIGATION

In point of error eleven, appellant argues that the trial court erroneously refused his request to give the final closing argument on the mitigation special issue, in violation of the Eighth and Fourteenth Amendments to the United States Constitution. He asserts that Article 36.07 does not govern procedure in capital cases, that the trial court has discretion to change the order of arguments in a capital case, that the burden of proof determines who has the right to closing argument, that the State has no burden of proof on the mitigation issue, and that the State "had the psychological advantage of responding to defense arguments on punishment and making the last impression on the jurors." We specifically rejected each of these arguments in *Masterson v. State,* 155 S.W.3d 167, 174–175 (Tex.Crim.App.2005), *cert. denied,* 546 U.S. 1169, 126 S.Ct. 1330, 164 L.Ed.2d 47 (2006). Point of error eleven is overruled.

## DEATH PENALTY PROCEDURE

In point of error twelve, appellant argues that the trial court erred in denying his "motion to preclude the death penalty as a sentencing option or, in [the] alternative quash the indictment," based on *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Bush v. Gore,* 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). Appellant argues that the future-dangerousness special issue should have been pled in the indictment because *Apprendi* requires that any fact other than a prior conviction that increases the maximum punishment for a crime must be alleged in the indictment and proven to a jury beyond a reasonable doubt. Citing *Bush v. Gore,* he argues that the death-penalty system is "arbitrary and capricious" because prosecutors have unfettered discretion to seek the death penalty and there are no uniform statewide standards to guide them in that decision. Appellant acknowledges that we have previously rejected these arguments. *Rayford v. State,*

125 S.W.3d 521, 533–534 (Tex.Crim.App. 2003); *Threadgill v. State,* 146 S.W.3d 654, 671–672 (Tex.Crim.App.2004). We decline to revisit these issues here. Point of error twelve is overruled.

### EXECUTION PROTOCOL

 In point of error thirteen, appellant contends that the trial court erroneously denied his pretrial motion to preclude the death penalty in violation of the Eighth and Fourteenth Amendments to the United States Constitution. In appellant's motion, he specifically challenged the use of pancuronium bromide in the lethal-injection procedure. Appellant's execution is not imminent. The method in which the lethal injection is currently administered is not determinative of the way it will be administered at the moment of appellant's execution. *Doyle v. State,* No. AP–74,960, 2006 WL 1235088, at *4, 2006 Tex.Crim. App. LEXIS 925, at *11 (Tex.Crim.App. May 10, 2006). Thus, his claim is not ripe for review. *Id.* Point of error thirteen is overruled.

We affirm the judgment of the trial court.

WOMACK, J., concurred.