**Opinion filed December 29, 2011**



# In The

# Eleuenth Court of Appeals

_____

### No. 11-09-00363-CR

_____

## VALENTIN RODRIGUEZ, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 238th District Court**

**Midland County, Texas**

**Trial Court Cause No. CR34036**

### M E M O R A N D U M   O P I N I O N

A grand jury indicted Valentin Rodriguez of three counts of indecency with a child by contact. The indictment also contained two enhancement paragraphs. The jury found Rodriguez not guilty of the offense alleged in the first count, but found him guilty of the offenses alleged in the other two counts. Rodriguez pleaded true to the enhancement paragraphs. The jury found them to be true and assessed Rodriguez's punishment at confinement for seventy-five years on Count Two and ninety-nine years on Count Three. The sentences were to run concurrently, but

were to run consecutively to other sentences that Rodriguez was already serving for other offenses. Rodriguez appeals his conviction in three issues. We affirm.

In his first issue on appeal, Rodriguez argues that the trial court erred when it did not sua sponte instruct the jury that the State must prove the existence of extraneous offenses beyond a reasonable doubt. Second, he asserts that the trial court reversibly erred when it failed to grant him a continuance during the punishment phase of the trial. Finally, Rodriguez claims that the evidence was legally and factually insufficient to support the verdict of the jury on Counts Two and Three.

We will first review Rodriguez's sufficiency arguments. Rodriguez challenges the sufficiency of the evidence to support the verdict. We review a sufficiency of the evidence issue, regardless of whether it is denominated as a legal or as a factual sufficiency claim, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.— Eastland 2010, pet. ref'd). Under the *Jackson* standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

The victim, C.R., testified. She told the jury that her date of birth was July 1, 1991, and that she had lived in Wisconsin with her maternal grandmother and her step-grandfather until she was fifteen years old. When she was fifteen, her grandmother and step-grandfather decided to send her to her mother in Virginia. C.R. and her sister moved to Virginia and lived there with their mother and stepfather. They lived there about six months, and in early February 2007, the four of them moved to Midland to live with Rodriguez, C.R.'s maternal grandfather.

Rodriguez lived in a house that essentially consisted of a living room/bedroom/kitchen combination and a bathroom. There was also a trailer on Rodriguez's property, and it was located a few feet from the house. C.R., her mother, her stepfather, and her sister intended to live in the trailer when it was made suitable. They moved into Rodriguez's house for a few days while they readied the trailer.

After the trailer was ready, C.R., her mother, her stepfather, and her sister moved into it. C.R. lived in the trailer for only a few days before she got into a fight with her mother and moved back into Rodriguez's house.

C.R. was still living with Rodriguez on Saturday, February 24, 2007. It was cold that day, and C.R. and Rodriguez stayed inside and watched movies all day. C.R. testified further that there were neither sofas nor chairs in the living area; there were only two beds, a dresser with a television on it, a heater, and a table. C.R. said that, because the television was facing Rodriguez's bed, because it was cold, and because the heater faced Rodriguez's bed, she lay down with him to watch movies.

C.R. testified that, as she was falling asleep, Rodriguez began to rub her "where [she] pee[s]." He also tried to touch her breasts but was not able to because of the position of her arms. At some point, he pulled down C.R.'s pajama bottoms and her panties and stuck "his private in [her] butt." As a matter of clarification, she testified that he actually never placed his "private" inside her body, just inside her "butt cheeks." He stopped when C.R.'s mother came into the house. She had come to the house to get coffee for C.R.'s stepfather. After her mom got the coffee and left, C.R. went back to her own bed. C.R. told the jury that, although she was scared, she eventually went to sleep.

The next morning, C.R.'s mom came back for more coffee. After she left, Rodriguez said, "Burr, it's cold," and got into bed with C.R. C.R. said that Rodriguez started "rubbing [her] butt." He pulled her pajamas and underwear down and "did what he did the night before." Eventually, he stopped, and when he did, she felt "something cold and wet on [her] butt." Rodriguez cleaned her up and pulled up her pajamas; C.R. got up and took a shower. When she got in the shower, C.R. took her clothes off and laid them on the bathroom floor between the shower and the toilet. These clothes included a pair of blue panties that C.R. had been wearing that night.

Daniel J. Lindley, a forensic scientist in the DNA section of the Texas Department of Public Safety crime laboratory, testified that he found semen in the back crotch area of those blue panties. He compared known blood of C.R. as well as known blood from Rodriguez with the semen stain found on the blue panties. Lindley performed DNA tests in this case, and he testified that he could say to "a reasonable degree of scientific certainty, Suspect V. Rodriguez is the source of the sperm cell fraction of the stain from the panties." The evidence shows that

3

Rodriguez could not be excluded as the contributor of the stain and that the "probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 370.1 quintillion for Caucasians, 1 in 319.7 sextillion for Blacks, and 1 in 439.6 quadrillion for Hispanics."

On the second day of the events described to the jury by C.R., she talked to her friend, Monica, and told her about what had happened; she also told Monica's boyfriend, Mandito. Mandito and some of his friends confronted Rodriguez and then "started beating him up."

In testimony before the jury, Rodriguez denied the criminal charges. Rodriguez testified that, on the day of the alleged offenses, C.R. asked him to spend the whole day with her and watch movies. At some point in time while they were watching movies, a lady came to the house. Rodriguez told the jury that the lady was a "friend with privileges" and that he told C.R. that he was a man with "some needs" and wanted to be alone with this friend. C.R. later came back in the house and saw Rodriguez having intercourse with the friend; the friend immediately got up and left.

C.R. told the jury that there were no females who came by that day, that Rodriguez had not told her to stay outside while he went inside with a lady, and that she had not walked in on Rodriguez and a lady having intercourse that day or any other day.

Rodriguez testified that, after the lady left, he and C.R. continued to watch movies. C.R. was lying on Rodriguez's bed while they watched movies; they were under separate covers and stayed in that same bed all night. Rodriguez told the jury that some of the scary movies did not appeal to him and he fell asleep around midnight and that C.R. went to her own bed around 6:00 or 6:30 the next morning.

Law enforcement officers arrested Rodriguez later that day. Midland County Corrections Officer Adam Hilliard testified that, the morning after the officers arrested Rodriguez, Rodriguez asked to make a telephone call. During that telephone call, Officer Hilliard overheard Rodriguez ask a friend, Brad B. Lawrence, to get a blanket out of the washing machine and put it in the dryer. He also asked Lawrence to get some clothing out of what the officer believed to be the bathroom, wash the clothes, put them in a plastic bag, and put them in a closet so that his daughter would not come and take them. He seemed to be concerned about a white T-shirt, some socks, and underwear.

4

Miguel Ramos, a Midland County jailer, also overheard the telephone conversation between Rodriguez and Lawrence. He recalled that Rodriguez said something to the effect of "do it now."

Lawrence also testified. He told the jury that he was at Rodriguez's property when he received a telephone call from Rodriguez at the jail. Rodriguez wanted him to do some laundry. Lawrence put soap in the washing machine, but he could not get the washing machine to start and, therefore, did not wash the laundry.

Sergeant Rick Rowland with the Midland County Sheriff's Office participated in the execution of a search warrant at Rodriguez's house. He found the blue panties that contained semen stains. He found that the washing machine contained soap, and he also found a blanket or comforter in the dryer. Lawrence was at Rodriguez's property when Sergeant Rowland performed the search at around two o'clock in the afternoon. Sergeant Rowland had a brief conversation with Lawrence. Lawrence told the sergeant that he was there to pick up some clothes, wash them, put them in a plastic bag, and put the bag in a closet. Lawrence said that he put the clothes in the washer but that he could not get it started. Although photographs of the scene show that Lawrence was present when the search warrant was executed, Lawrence testified that he did not remember seeing any deputies there at the time; he was extremely intoxicated at the time that he talked to Sergeant Rowland.

Because C.R. had been living elsewhere, Rodriguez actually had known his granddaughter for approximately nine days. However, he described C.R. to the jury as a real fighter; she "can really fight you." He also told the jury that C.R. fought with her grandmother, her step-grandfather, her stepbrothers, and her mother. On one occasion, in Rodriguez's presence, C.R. hit her mother, and in response, Rodriguez slapped C.R. "real hard"—so hard it broke a bone in his hand—because he thought she was about to hit him. She fell to the floor and then got up and ran about ten or fifteen feet away, "cussing [Rodriguez] out." Rodriguez and another prisoner put the "broken" bone back in place after he was in the jail. Although she admitted to some fighting with her mother, C.R. denied that Rodriguez ever slapped her. Rodriguez also testified that C.R.'s mother had told him to watch out for C.R. because she was "a snake. She's gonna bite you." Rodriguez told the jury that he had no idea how his "sperm got in [C.R.'s] panties."

5

Although Rodriguez and C.R. told different versions of the events, a jury is the trier of fact and may accept or reject any or all of the testimony of any witness. *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992). We have reviewed all of the evidence in the light most favorable to the verdict, and we hold that a rational trier of fact could have found the elements of the crimes beyond a reasonable doubt. We overrule Rodriguez's third issue on appeal.

In his first issue on appeal, Rodriguez argues that the trial court erred when it did not instruct the jury that the State was required to prove extraneous offenses beyond a reasonable doubt. The extraneous offenses to which Rodriguez refers are in fact a part of Rodriguez's prior criminal record, not extraneous offenses. *Bluitt v. State*, 137 S.W.3d 51, 54 (Tex. Crim. App. 2004). Those offenses, which were introduced into evidence and to which Rodriguez pleaded true, had already been subjected to the "beyond a reasonable doubt" burden of proof. Further proof of guilt beyond a reasonable doubt was not necessary, and the trial court did not err when it did not instruct the jury on extraneous offenses. We overrule Rodriguez's first issue on appeal.

Rodriguez argues in his second issue on appeal that the trial court abused its discretion when it refused to grant him a continuance so that he could get witnesses for the punishment phase of the trial. We review a trial court's decision to grant or deny a motion for continuance for an abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007). A defendant must show that he was actually prejudiced when the trial court denied his motion.

The jury found Rodriguez guilty on a Thursday. The punishment hearing began the following Monday. Just prior to the start of the punishment phase of the trial, Rodriguez's attorney told the judge that Rodriguez had given him some information on how to contact certain witnesses he wanted to call. Rodriguez's attorney told the court that he had tried to reach the witnesses at the telephone numbers Rodriguez had given him, but that he could not reach the witnesses. He wanted twenty-four hours to try to contact them in some other manner. Rodriguez did not show the trial court what the testimony of these witnesses would be if they were to appear. Rodriguez has failed to establish that he suffered any specific prejudice when the trial court denied his oral motion for continuance. Absent a showing of actual prejudice, we cannot hold that the trial court abused its discretion when it denied Rodriguez's oral motion for continuance. *See Heiselbetz v. State*, 906 S.W.2d 500, 511 (Tex. Crim. App. 1995) (where there

was no showing of actual prejudice, there was no abuse of discretion).  We overrule Rodriguez's second issue on appeal.

We affirm the judgment of the trial court.


JIM R. WRIGHT

CHIEF JUSTICE


December 29, 2011

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of:  Wright, C.J.,
McCall, J., and Hill, J.[1]

---

[1]John G. Hill, Former Justice, Court of Appeals, 2nd District of Texas at Fort Worth, sitting by assignment.