

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,063

**LEJAMES NORMAN, Appellant**

**v.**

**THE STATE OF TEXAS**

ON DIRECT APPEAL
FROM CAUSE NUMBER 06-1-7346 IN THE 24TH JUDICIAL DISTRICT COURT
JACKSON COUNTY

**HERVEY, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

Appellant pled guilty to a capital-murder indictment that charged him with using a firearm

to murder three people (Sam Roberts, Tiffani Peacock, and Celso Lopez) in the course of committing

or attempting to commit burglary or robbery during the same transaction or scheme. Following a

guilt-phase proceeding at which the State presented evidence to support appellant's guilt, the trial

court instructed the jury to find appellant guilty as charged in the indictment, and the jury did so.

Pursuant to the jury's answers to the special issues at the punishment phase, the trial court sentenced

appellant to death. Appellant raises five points of error on direct appeal. Deciding that these points have no merit, we affirm.

The evidence presented in this case supports findings that appellant and an accomplice named Ker'sean Ramey murdered the three victims in their home in the course of committing burglary and robbery.[1] The three victims, who were appellant's neighbors, were shot multiple times. Appellant testified at the punishment phase and claimed that he was remorseful and that he wanted to apologize for murdering the victims. He also testified about a troubled childhood, including his father being shot and killed by police in California. Appellant claimed that it was mitigating that he cooperated with the police by confessing to this capital-murder offense and that he assisted the prosecution by testifying against Ker'sean Ramey without any kind of a deal for doing so. Appellant also testified that he had a dream in which he apologized to one of the victims (Tiffani) for murdering her.

> Q. [DEFENSE]: Lejames, you had once told me way back that one of the reasons you were cooperating and confessing when you eventually started to tell the truth, you had something about some dreams. Do you remember telling me that?
>
> A. [APPELLANT]: Yes, sir, I--
>
> Q. What were these dreams you were telling me you had?
>
> A. Tiffani, she–she was in the dream. I don't want to say she–I had a dream about Tiffani and I was–I told her I never wanted to be like this. I said I was going to make it right, I apologized and she looked at me. I woke up and started trying to confess.

Through its cross-examination of appellant and permissible inferences from other evidence that it presented, the State maintained that appellant was unremorseful, that he testified against

---

[1] Ramey was also convicted of capital murder and sentenced to death in a separate trial. *See Ker'sean Olajuwa Ramey v. State*, No. AP-75,678 (Tex.Cr.App., delivered February 11, 2009) (not designated for publication).

Ker'sean Ramey only for the purpose of improving his legal situation, and that he was a "rotten to the core" and "worst of the worst" murderer. The State also presented evidence of appellant's lengthy criminal history since at least the age of ten, including evidence of his misbehavior in the county jail while awaiting trial for this offense. The State presented other evidence that appellant gave several statements to the police during the course of which appellant initially denied shooting any of the victims but eventually admitted to shooting all three of them. The State's theory was that appellant would not admit to anything until the evidence compelled him to do so and that his eventual admission to shooting all three of the victims was not out of any sense of remorse.

In point of error one, appellant claims that the State's punishment-phase jury argument, suggesting that appellant may have committed unknown crimes *before* the age of ten, denied appellant due course of law under the Texas Constitution and due process of law under the United States Constitution by depriving him of a fair and impartial trial. The record reflects that appellant was almost twenty years old when, on August 24, 2005, he used a firearm to commit the capital-murder offense in this case.[2] The State presented evidence that, when he was ten years old, appellant was involved along with another nine-year-old in two armed robberies involving a firearm on the same day. The State also presented evidence that, since then, appellant has committed several burglaries and assaults and that he has used and sold drugs. While in the county jail awaiting trial for this offense, appellant made weapons, planned escapes, and talked about killing people. Appellant held a shank to the neck of a 65-year-old female jailer and threatened to kill her during an unsuccessful escape attempt with another county-jail inmate. During closing jury arguments, the

---

[2] Appellant's date of birth is November 26, 1985.

State made the following argument:

> [STATE]: The book didn't just open on Lejames Norman when he killed those three people. The book opened on Lejames Norman as Mrs. Guenther said, when he was 10 years old. Folks, 10 years old. And you say, oh we know all about that, Mr. Bell, you don't have to tell us. Yes, I do. Because what was he doing when he was 10 years old. Bring up the part–I'm going to try–some of this will be a little awkward, but we worked last night in getting this so we don't have to, you know, hold you up. 904.
>
> Why am I showing you this? Well, folks, Lejames Norman at the age of 10 was at this park, a place where grandmothers take their grandchildren, like the victim, to play. A public place in broad daylight and what does Lejames Norman bring to this little public park here? He brings a pistol. And what does he tell you about that pistol? I'm going to show you that all throughout, all throughout he has lied and lied and lied and will only tell the truth when he is captured and caught in his lies. What did he say about this? I found that gun. Oh, some weeks before in the back of a truck. You know what that translates to? I stole it. At 10 years old he wants a pistol to help him, what do they call it, stang a lick. Commit a robbery. And this lady, this elderly lady walking with her–bring up No.–walking with her two grandchildren is walking here by the Burger King. There's your wall right there where he was sitting. He lied about that. I'm not going to go through those details. He said where he was. He said he just came over after all this happened. She's walking there and she gets a pistol pointed at her and told to give the money. And who runs off with the money? He does, Lejames Norman.
>
> She came to a public place with her grandchildren. And this isn't all. It got so good with him that he did it, what, again. Committed two. **Now, I'm going to say this to you because I believe this is a reasonable deduction from the evidence. I think you have only seen the tip of the iceberg of Lejames Norman, and I think that's reasonable assumption. Does anybody within the sound of my voice believe every crime he got–he committed he got caught? Does that sound reasonable? How many jacks did he have *before this and after this*?**
>
> [DEFENSE]: Excuse me, Judge. I'm going to object to arguing outside the record.
>
> [STATE]: It's a reasonable deduction from the evidence, Your Honor.
>
> [THE COURT]: Ladies and Gentlemen of the Jury, I'm simply going to instruct you that you are to confine yourself to the evidence, what you believe the evidence to be. Counsel is entitled to make reasonable deductions, but in considering the evidence you have to confine yourself to the evidence. Okay?

[DEFENSE]: And as to my objection, Judge, is it--

[THE COURT]: I'm going to overrule your objection.

[DEFENSE]: Okay.  Thank you.

[STATE]: If you don't believe it is a reasonable deduction that he didn't commit any other crimes other than the ones we caught him with, so be it.  That is–that's ludicrous.  The tip of the iceberg.  That's all you see.

(Emphasis in bold and in italics supplied).[3]

Appellant argues on appeal that the State's reference to unknown crimes that appellant may have committed *before* the age of ten was outside the record and was a calculated effort to deprive appellant of a fair and impartial trial.  Appellant further argues that the State's "uninvited and manifestly improper request for the jury to speculate on aggravated robberies committed by the Appellant materially affected the jury where they returned a death verdict after obviously affirming the prosecutor's personal venom, and being inflamed by his improper summation."

The State argues that it is a reasonable deduction from the evidence that appellant committed other crimes for which he did not get caught especially, when it is shown that appellant was "apprehended for committing armed robberies at age 10." *See Gallo v. State*, 239 S.W.3d 757, 767 (Tex.Cr.App. 2007) (reasonable deduction from the evidence is a permissible area of jury argument). The State also argues that "it is common knowledge that quite often people who engage in numerous criminal activities are not always arrested and prosecuted for each and every offense they commit"

---

[3]

In his brief, appellant also cites to the State's subsequent and unobjected-to jury argument during which the State, while summarizing appellant's criminal history, argued, "He's 11 years old. Again, I guess this is all he's ever done . . . ."  Appellant also cites to other portions of the record where the State later argued without objection that it believed "that a man's character never drastically changes from youth to old age . . . ."  We do not read appellant's brief to challenge these unpreserved-for-appellate-review jury arguments.

and that it "is not an illogical deduction, from the evidence in this case, that appellant has not been arrested and charged with each and every offense that he committed from the time he was 10 years of age."

In disposing of this point of error, we initially note that appellant did not present any constitutional due-process or due-course-of-law objections in the trial court to the State's jury argument. These constitutional claims, therefore, are not preserved for appellate review. *See* TEX. R. APP. P. 33.1(a)(1); *Pena v. State*, 285 S.W.3d 459, 464 (Tex.Cr.App. 2009) (in order to preserve issue for appellate review, complaint on appeal must comport with complaint made at trial). The only claim that appellant preserved for appellate review is the claim that the State's jury argument, suggesting that appellant committed unknown crimes *before and after* the age of ten, was "outside the record."[4]

This Court has decided that jury argument, similar to the one that the State made in this case, is improper as being outside the record. *See Ex parte Lane*, 303 S.W.3d 702, 711-12 (Tex.Cr.App. 2009) (in defendant's trial for possession of a large amount of methamphetamine, State's jury argument suggesting that defendant would sell these drugs to children and turn them into addicts was improper as being outside the record); *Borjan v. State*, 787 S.W.2d 53, 57 (Tex.Cr.App. 1990) (in defendant's trial for aggravated rape of a child, it would have been improper and outside the record for the State to have "called upon the jury to speculate about other crimes that the [defendant] may have committed against other children"); *Walker v. State*, 664 S.W.2d 338, 340 (Tex.Cr.App. 1984) (in defendant's trial for burglary of a habitation, it was improper and outside the record for the State

---

[4] Appellant objected that it was "outside the record" when the State argued, "How many jacks did he have before this and after this?"

to argue that the defendant's "job" was to commit burglaries and that the defendant made his "living" by committing burglaries). In this case, we will assume that the State's jury argument constituted error as a matter of state law and consider whether this state-law error was harmless under TEX. R. APP. P. 44.2(b). *See Gallo*, 239 S.W.3d at 767 (Rule 44.2(b) harm analysis for improper jury argument uses "the following three-factor test: (1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and, (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction)";[5] *Mosley v. State*, 983 S.W.2d 249, 258-60 (Tex.Cr.App. 1998).

The record in this case reflects that the complained-of argument was only a small portion of the State's entire jury argument. The State instead emphasized appellant's known criminal history, the brutal facts of the offense, the various statements appellant gave to the police and his demeanor on the stand to argue that appellant is "rotten to the core" and is the "worst of the worst." For example, the State argued:

> [STATE]: But what this–what [the defense] says is a bad thing is to take this gun, cock it, stick it to the head of that good friend of his who hugged him in the halls and pull the trigger. Is that it? Is that the end of the bad things? No. He then takes and cocks it and puts it to the head of Sam Roberts and I'll show you in a minute, and shoots him with his hand behind his head. Then he leans down. I mean, this isn't premeditated. He's already shot Tiffani point blank contact. He's already shot Sam Roberts contact. He cocks it again. Is he the worst of the worst? Is he rotten to the core? You tell me what rotten to the core is. If leaning down and putting a gun to the back of somebody's head and pulling the trigger and saying that aint enough, I aint out of bullets, bang, I'm going to do it again. Bang. If that isn't rotten to the core, if that isn't the worst of the worst, then somebody show me who is.

---

[5] The third factor in this case would focus on the strength of the evidence supporting the jury's answers to the special issues.

* * *

And you heard what he said when Kersean Ramey said I should have F'd that sexy bitch before she died. What did he say? I didn't miss a beat. Didn't faze me. But what did he do? I mean, what were his actions? Can you imagine somebody who isn't the worst of the worst going home, going to his girlfriend's after he had just executed three people and taking Zanax, having sex and then he's at peace.

* * *

Two armed robberies at ten, three burglaries of the Carver school within less than a month after getting here to Texas. Lying about his involvement. The criminal trespass and mischief breaking into the Formosa Apartments. Breaking the door for no reason, lying about it. Assaulting Jessica Castro, lying about it. Still lying about it on the stand I didn't assault her. Hitting the mama of his babies with bare hand, with the heel of his hand three times. Bowing up to the officer with his fist clinched when the officer came.

This on the other side of the balancing. Wouldn't take his daughter, yet she's precious to me. Doesn't believe in child support. Resisting arrest after the triple homicide. Blaming KK for it. Bought a gun before the triple homicide for some weed. Killed these people in cold blood and still lies about it. Watched us the next day when we investigated. Involving Daisy Torres by marrying her. Break the cycle. Please. Making a shank, holding it to Betty's throat, threatening to kill her. His statement, his foul attitude and mouth. Making another shank, another shank, Victoria. All of this.

We further note that the evidence supporting the jury's answers to the special issues is strong.

The evidence supports findings that appellant has a known and lengthy criminal history beginning by the age of ten that includes the brutal murders of the three victims in this case followed by holding a shank to the neck of a sixty-five-year-old female jailer and threatening to kill her during a failed escape attempt from jail while, according to appellant's trial testimony, he was feeling extreme remorse for murdering the three victims in this case. Although no curative measures were taken to cure any prejudice from the State's jury argument, we decide that, on this record, any error in this argument had little, if any, influence on the jury's answers to the special issues. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Cr.App. 1998) (non-constitutional error is harmless under Rule 44.2(b) when "the appellate court, after examining the record as a whole, has fair assurance that the

error did not influence the jury, or had but a slight affect"). Point of error one is overruled.

We understand appellant to claim in point of error two that the trial court should have *sua sponte* provided the jury with a life-without-parole sentencing option and that the trial court's failure to do so egregiously harmed him. Appellant committed this offense on August 24, 2005, about one week before the life-without-parole amendments to Article 37.071, TEX. CODE CRIM. PROC., went into effect on September 1, 2005.[6] These amendments contained a savings clause providing that an "offense committed before the effective date of this Act is covered by the law in effect when the offense was committed, and the former law is continued in effect for that purpose."[7] Without any objection from appellant, the trial court submitted a jury instruction that a life-sentenced appellant would not be parole-eligible for 40 years as required by former Article 37.071, which is the state law applicable to appellant's case and the law in effect when appellant committed this offense.

Appellant claims for the first time on appeal that the trial court should have *sua sponte* disregarded the state law applicable to appellant's case and provided the jury with a life-without-parole sentencing option that is not applicable to appellant's case.[8] Appellant must show that it was error for the trial court not to have *sua sponte* provided the jury with a life-without-parole sentencing

---

[6]

*See* Acts 2005, 79th Leg., R.S., ch. 787, §§§§ 7, 8, 9, 18 (SB 60), eff. September 1, 2005, currently codified in Article 37.071, § 2 (e)(2)(A) (requiring trial court to instruct jury that trial court will sentence a capital defendant to life without parole if the jury finds circumstances that do not warrant a sentence of death).

[7]

*See* Acts 2005, 79th Leg., R.S., ch. 787, § 17(b) (SB 60).

[8]

This Court has decided that the law applicable to appellant's case in former Article 37.071, requiring the 40-year parole-eligibility jury instruction that was given in this case, did not violate the federal constitution by not providing a jury with a life-without-parole sentencing option. *See Fuller v. State*, 253 S.W.3d 220, 233 (Tex.Cr.App. 2008).

option and that this "egregiously harmed" appellant. *See Tolbert v. State*, 306 S.W.3d 776, 779 (Tex.Cr.App. 2010) (reviewing court applies "egregious harm" standard only when it finds jury-charge "error" to which the defendant did not object).

To support his argument, appellant relies on a repealed version of Federal Rule of Criminal Procedure 59, which provided that the federal rules of criminal procedure took effect on September 1, 1945, and that they "govern all criminal proceedings thereafter commenced and so far as just and practicable all proceedings then pending."[9] Appellant seems to argue that this former version of Rule 59 preempted the state law applicable to his case in former Article 37.071 and required the trial court to submit a life-without-parole sentencing option under the current version of Article 37.071 because appellant's trial was commenced after this current version of Article 37.071 took effect on September 1, 2005. We reject this argument and note, for example, that the federal rules of criminal procedure do not apply to state-court proceedings in Texas courts because they apply only to "criminal proceedings in the United States district courts, the United States Courts of Appeals, and the Supreme Court of the United States." *See* FED. R. CRIM. P. 1(a), 18 U.S.C.A. (West 2008). Point of error two is overruled.

Appellant claims in point of error three that he was denied a fair trial when "the prosecutor, albeit without objection, routinely and continuously became a witness for the State." *See Powers*

---

[9] We note that this version of Rule 59 was deleted in 2002, and is no longer in effect. *See, e.g.,* Advisory Committee Notes to FED. R. CRIM. P. 59, 18 U.S.C.A. (West 2008) (noting that "former Rule 59, which dealt with the effective date of the Federal Rules Of Criminal Procedure, was deleted" in 2002). We further note that current Rule 59 was added in 2005 and that it governs matters which a federal district judge may refer to a federal magistrate judge. *See id*. (noting that current Rule 59 "is a new rule that creates a procedure for a district judge to review nondispositive and dispositive decisions by magistrate judges").

*v. State*, 165 S.W.3d 357, 359 (Tex.Cr.App. 2005) (discussing Rule of Professional Conduct Disciplinary Rule 3.08 prohibiting a lawyer from assuming "dual roles" of advocate and witness); TEX. DISCIPLINARY R. PROF'L CONDUCT 3.08(a) (prohibiting a lawyer from accepting or continuing "employment as an advocate in a contemplated or pending adjudicatory proceeding if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client"). Appellant's third point of error states verbatim:

> Appellant was denied the structure of a fair trial . . . where at punishment phase the prosecutor, albeit with only one objection, routinely and continuously became a witness for the State on the issues of future danger and no mitigation.

Appellant argues that the "entire punishment phase rests in pertinent part on the testimony of the prosecutor; a trial more inquisitorial than adversarial and hence structurally unfair where death was imposed." The record reflects that the prosecutor did not become a "witness" in the sense that the prosecutor took the stand and provided testimony under oath. Appellant cites to numerous instances in the record where he claims that the prosecutor became a witness through the prosecutor's questioning of various witnesses.

The State argues that "appellant's allegation that the prosecutor became a witness in this cause through his questioning is without foundation." The State also argues, "All of the instances referred to are situations where the prosecutor was either explaining the basis for a question to a witness so that the witness could answer properly or were [sic] pointing out unopposed facts as a reference for a question." The State further argues:

> Quite frankly, the undersigned is unable to discern a valid objection to the vast majority of the instances referred to by appellant. While some might be arguably objected to as leading, they all involved readily provable facts that experienced trial counsel would be hesitant to object to for fear that a jury would merely feel that he is nitpicking. To say that a prosecutor, when stating a provable reference for a witness to answer a question, is becoming a witness in the case is a gross

overstatement.

We set out the instances, cited in appellant's brief, where appellant claims that the State became a witness through its questioning of various witnesses.

Q. [STATE]: Mr. Tamez, from having listened to the grand jury CD as well as your independent recollection, do you recall me being present during that time?

A. [GRAND JURY MEMBER TAMEZ]: Yes, sir. I do.

Q. Did I go through all–you don't know all, but did I go through certain rights and warnings and admonitions orally with Defendant Lejames Norman prior to his [grand jury] testimony?

A. Yes, sir. You did. Yes, sir. That is correct.

Q. And did I ask him as to each of those rights and warnings whether he understood those rights?

A. You did. Yes, sir.

Q. And did I ask him if he was knowingly and intelligently and voluntarily waiving those rights and doing it orally?

A. Yes, sir. You did. That is correct.

Q. And did I do that prior to him giving any grand jury testimony?

A. That is correct.

Q. Once he–did he indicate that he understood those rights and that he was knowingly, intelligently and voluntarily waiving those rights?

A. Yes, sir. He did.

Q. Once he did that did I then present Mr. Norman with certain rights, warnings and admonitions in writing?

A. That is correct. Yes.

Q. And did I ask the bailiff to hand him those written warnings and rights prior to me going over them with him again?

A. Yes.

Q. And did I once again go through each of those rights and each of those warnings with Mr. Norman in writing before he gave his grand jury testimony?

A. Yes, sir.

Q. And did I ask him if he was again intelligently, knowingly and voluntarily waiving those rights and specifically requesting permission of the grand jury to testify?

A. Yes, sir.

Q. Did I then ask him to sign that written waiver of his rights if that's what he desired to do?

A. Yes.

* * *

Q. I'm going to show you what's been marked for identification purposes as State's Exhibit 911 which I'll represent to you, sir, are the certified copy [sic] of the juvenile records as it pertains to this incident. You and I have looked at this, have we not sir?

* * *

Q. Officer Chaffin, while [the defense] is looking at that, I'll represent to you, and I don't know if you know what's happened since, but I'll represent that Mr. Wooldridge and I went to visit with Jamal Gibson and he was at that time in prison. Are you aware that he's been to prison?

A. Yes.

Q. And I'll also represent that he was somewhat less than cooperative, but do you know what his status is now, what–whether he's in prison or out on parole or what–

* * *

Q. Reason I ask you is that when we were looking at that together last night, there was some mention of a robbery the day before and then when Mr. Norman was giving the statement he was describing two robberies that same day. Was that–but you just can't tell, can you?

* * *

Q. Would you mind, did you at my request, remember I asked you if you could draw kind of a diagram of where Mr. Norman was living at the time and where these other individuals that all this kind of resulted from? Can you do that for us?

* * *

Q. Remember I asked you it referred to him in the report as two years old and then another time is four years old. Do you recall how old he was actually?

* * *

Q. That's all right. In all fairness to the Defense, let me–I believe from when Officer

Wooldridge and I were out there–Chief Wooldridge and I were out there that the pistol was actually on the west side of the fence in a little kind of a–had been tossed by Mr. Gibbs before he–and–

* * *

Q. And if we look at–I'll represent that when Chief Wooldridge and I went out there we took some photographs and this is the same area. Only difference this being the it's now brick or concrete or whatever instead of chain link. But this gives a little better view, does it not, of the area where he was running?

* * *

Q. Yesterday I believe you originally testified when you were asked about it whether you were told about how the pistols were disposed of you said that Sean told you he threw them off the bridge?

* * *

[STATE]: And then this is re-direct by me to Mr. Norman [in Ker'sean Ramey's trial]. You'll be reading my questions.

Q. [READING BY MRS. GUENTHER]: Mr. Norman, have I put anything in your mind by anything that I've ever said to you that would cause you to believe or speculate that there is a possibility of a deal? Have I ever done that, sir?

A. No, sir. You have not.

Q. [READING BY MRS. GUENTHER]: Have I winked at you, nodded at you or done anything in that fashion?

A. No, sir. You have not.

Q. [READING BY MRS. GUENTHER]: In fact, have I mentioned to you that you're going to trial this year? Have I told you that?

* * *

Q. And at my request have you reviewed the certified copy of the court records in the County Clerk's office as it pertains to this particular case?

* * *

Q. Okay. And I believe your cohort over there Mr. Robert Martinez met with him when I came out to visit with you; is that right?[10]

* * *

Q. Prior to you testifying, did I–did you furnish me some photos that you took there at the scene?

* * *

---

[10]

The record reflects that this was a question that the defense asked a State's witness on cross-examination.

Q. Go to the next one. Ms. Castro is going to testify in a minute and I believe she's going to testify that earlier she was choked. Is there anything here to–that would substantiate?

\* \* \*

Q. I think you also told me that when he was in jail after this triple homicide that he asked you to marry him; is that correct?

\* \* \*

Q. And I think you told me–correct me if I'm wrong–you said because it wouldn't be any kind of life for me; is that right?

\* \* \*

Q. And do you remember me asking you about Daisy Torres, you know, why would she marry him, you remember, or why would he want to marry–you remember what you told me?

\* \* \*

Q. I'm going to ask you. We talked about this a little bit the other day. When this offense occurred, this crime, and you told me that at one point Lejames finally admitted to you exactly what happened, correct?[11]

\* \* \*

Q. Uh-huh. Did you tell me months ago when we met that he knew he had ruined the rest of his life and he cried to you that he wouldn't be with his kids?[12]

\* \* \*

Q. Okay. And you mentioned–you told [the defense] he would just push me on these other occasions. Do you remember telling me that he would also hit you in the legs too?

\* \* \*

Q. Sheriff, I'm actually because of your commitment I'm going out of order to an incident that occurred on September 25 of 2007. And without me having to go into all of the particulars, would you describe the cell that Mr. Norman was in and whether there's other inmates in the cell? Just give them a brief description, please.

\* \* \*

Q. Reason I wanted to put you on out of order, I know you're a little more familiar. Would you explain so the jury can understand it a little better about what a pipe rack is and about another escape that you had at one point where they were using the pipe rack?

\* \* \*

Q. Did you at my request try to go and find that leafy substance? I think, Cassie, did

---

[11]

The record reflects that this was a question that the defense asked a State's witness on cross-examination.

[12]

The record reflects that this was a question that the defense asked a State's witness on cross-examination.

you do that?

*  *  *

Q. It just happened to come right after that. That's just a coincidence; right? After I confronted you and said, Mr. Norman, we're going to know which guns fired which shots. And I said, we can definitely tell which pistol was used to shoot Tiffani. Do you remember me telling you that?

*  *  *

Q. So, that's just when you decided to get your business straight with Tiffani is when I said, we'll know which pistol was used to shoot Tiffani; right?

*  *  *

Q. Remember me saying, well, but Mr. Norman, different people say you were wrestling with Sam and he was getting the better of you when Sean came in and shot him. I said, are you sure it didn't happen like that, Mr. Norman. Do you remember saying, positive, positive?

*  *  *

Q. You looked me right in the eye when you were under oath and told me you were positive you didn't have–you weren't in the room when Sam was shot, just like you've told this jury you're positive you didn't put the gun to the back of the head of Sam Roberts and shoot him; isn't that true?

*  *  *

Q. And then about the dirt–I'm sorry. For the record that was on Page 124 of the trial transcript. And then on Page 142 of the trial transcript I asked you, do you remember making any statement or giving Kersean any advice when you were going to the home about the sidewalk or anything of that nature? And you said, you mean not to step in the dirt, but–I said, did you say anything to him about that. And you said, yes, sir. I asked you, what did you tell Kersean. Answer: Don't step in the dirt. Question: Why were you telling him that. Answer: Because it would leave footprints on the carpet or whatever. Is that correct?

*  *  *

Q. Problem is, Mr. Norman, and I'm being fair with you on this. Problem is when I asked him to tell us what happened, he wasn't going to tell anything on his homeboy. He didn't say anything.

The record reflects that appellant did not object to any of these prosecutorial comments, which appellant claims on appeal were "testimony." We decide that appellant failed to preserve any error in these comments. *See* Tex. R. App. P. 33.1 (a)(1).

Appellant cites to an instance where he did object during the prosecutor's cross-examination of appellant. The record further reflects that the trial court instructed the jury to disregard the prosecutor's objectionable comment, but denied appellant's motion for a mistrial.

Q. [STATE]: Lastly, then I'm through, Mr. Norman, is I want to talk to you about this dream. And I'm going to tell you right up front I really find that insulting, and let me tell you why.

[DEFENSE]: Excuse me. For the record, Judge, I object to the giving his opinion he finds it insulting and--

[STATE]: I withdraw it. Let me tell you what you--

[THE COURT]: Let's avoid the side bars.

[STATE]: Sure.

[DEFENSE]: And I ask the Court to instruct the jury to disregard, please.

[THE COURT]: Ladies and Gentlemen of the Jury, you are instructed to disregard the comment that was made by the district attorney.

[DEFENSE]: And for the record, Judge, we move for a mistrial.

[THE COURT]: Overruled.[13]

We decide that appellant's trial objection that the prosecutor was "giving his opinion he finds it insulting" does not comport with his claim on appeal that the prosecutor abandoned his role as an advocate and became a "witness." *See Pena*, 285 S.W.3d at 464 (in order to preserve issue for appellate review, complaint on appeal must comport with complaint made at trial). And, assuming appellant preserved this claim for appeal, we further decide that the trial court's instruction to

---

[13]

Immediately after this, appellant reaffirmed his earlier testimony on direct examination by the defense that he confessed to the triple homicide in this case because of the dream that he had about apologizing to Tiffani for murdering her:

Q. [STATE]: When [the defense] asked you why you confessed, do you remember you said, well, it's because I had this dream of Tiffani. I saw her and I told her I never wanted it to be like this. I'd make it right. I apologized to her and then I started confessing. That's what you told this jury, didn't you?

A. [APPELLANT]: Yes, sir.

disregard was sufficient to cure any harm and that the trial court, therefore, did not abuse its discretion to deny appellant's mistrial request. *See Ladd v. State*, 3 S.W.3d 547, 567 (Tex.Cr.App. 1999) (asking of an improper question seldom calls for a mistrial because any harm can usually be cured by an instruction to disregard, and a mistrial is required "only when the improper question is clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors"); *see also Young v. State*, 137 S.W.3d 65, 69 (Tex.Cr.App. 2004) ("A grant of a motion for mistrial should be reserved for those cases in which an objection could not have prevented, and an instruction to disregard could not cure, the prejudice stemming from an event at trial–i.e., where an instruction would not leave the jury in an acceptable state to continue the trial."); *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex.Cr.App. 2004) ("A mistrial is the trial court's remedy for improper conduct that is so prejudicial that expenditure of further time and expense would be wasteful and futile.") (internal quotes omitted). Point of error three is overruled.

Appellant claims in point of error four that the "death penalty sentence violates the Eighth Amendment, United States Constitution (cruel and unusual)." And in point of error five, appellant claims that this sentence "violates the treaty of the United Nations Charter which hold [sic] that all human beings have dignity and worth, and that all human beings would receive equal treatment in the administration of justice." This Court has rejected these claims. *See Williams v. State*, 301 S.W.3d 675, 694 (Tex.Cr.App. 2009), *cert. denied*, 130 S.Ct. 3411 (2010) (rejecting claim that death penalty is cruel and unusual punishment under the federal constitution); *Hinojosa v. State*, 4 S.W.3d 240, 252 (Tex.Cr.App. 1999) (rejecting claim that United Nations Charter compelled reversal of the defendant's death sentence). Points of error four and five are overruled.

The judgment of the trial court is affirmed.

Hervey, J.

Delivered: February 16, 2011
Do Not Publish