# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00480-CR

William Thomas Watts, Appellant

v.

The State of Texas, Appellee

### FROM THE DISTRICT COURT OF CONCHO COUNTY, 119TH JUDICIAL DISTRICT
### NO. DIS-08-01654, HONORABLE BEN WOODWARD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Following a bench trial, the district court found appellant William Thomas Watts guilty of the offense of aggravated sexual assault of a child and assessed punishment at 50 years' imprisonment. In three issues on appeal, Watts asserts that the district court abused its discretion in denying his motion to suppress evidence and in denying his motion for a continuance, and that the evidence is insufficient to support the district court's finding of guilt. Additionally, through our own review of the record, we have found a clerical error in the written judgment of conviction. We will modify the judgment to correct the clerical error and, as modified, affirm the judgment.

## BACKGROUND

Watts was charged with sexually assaulting his daughter, who was approximately nine years old at the time of the alleged offense. The evidence considered by the district court during trial, which we discuss in more detail below as it is relevant to Watts's issues on appeal, included the testimony of the victim, V.W.; Mary Watts, the victim's mother; Kathy Sparks, a sexual assault

nurse examiner; Sergeant Matt Mull of the Texas Department of Public Safety, the law-enforcement officer who had interviewed Watts; and Watts, who testified in his defense. Additionally, Watts's written statement to law enforcement, in which he admitted to sexually touching and exposing himself to his daughter (but denied having "intercourse" with her), was admitted into evidence, over a pretrial motion to suppress filed by Watts. After hearing the evidence, the district court found Watts guilty as charged and assessed punishment as noted above. This appeal followed.

## ANALYSIS

### Motion to suppress

In his first issue, Watts asserts that the district court abused its discretion in denying his motion to suppress the statement that he provided to law enforcement. Specifically, Watts asserts that the statement was not knowingly and voluntarily made.

"In review of a trial court's ruling on a motion to suppress, an appellate court must apply a standard of abuse of discretion and overturn the trial court's ruling only if it is outside the zone of reasonable disagreement." *Martinez v. State*, 348 S.W.3d 919, 922 (Tex. Crim. App. 2011) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). We are to apply a bifurcated standard of review, giving almost total deference to a trial court's determination of historic facts and mixed questions of law and fact that rely upon the credibility of a witness, but applying a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility determinations. *Id*. (citing *Guzman v. State*, 955 S.W.2d 85, 87-89 (Tex. Crim. App. 1997)). When reviewing a trial court's ruling on a motion to suppress, we view the evidence in the light most favorable to the ruling. *State v. Robinson*, 334 S.W.3d 776, 778 (Tex. Crim. App. 2011) (citing *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006)). "We will sustain the trial court's ruling

2

if that ruling is 'reasonably supported by the record and is correct on any theory of law applicable to the case.'" *Valtierra v. State*, 310 S.W.3d 442, 448 (Tex. Crim. App. 2010) (quoting *Dixon*, 206 S.W.3d at 590).

On appeal, Watts asserts that the district court abused its discretion in finding that his statement was voluntary.[1] *See* U.S. Const. amend. XIV; Tex. Code Crim. Proc. arts. 38.21, .22. A statement is "involuntary," for the purposes of federal due process, only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker. *See Colorado v. Connelly*, 479 U.S. 157, 164-65 (1986); *Alvarado v. State,* 912 S.W.2d 199, 211 (Tex. Crim. App. 1995). Under state law, a involuntariness claim need not be predicated on police overreaching of the sort required under federal due-process analysis. *Oursbourn v. State*, 259 S.W.3d 159, 171 (Tex. Crim. App. 2008). Instead, "the focus is upon whether the defendant voluntarily made the statement. Period." *Id*. The determination as to whether a confession was voluntarily rendered must be analyzed by examining the totality of the circumstances. *Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991); *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007). Relevant factors to consider when determining whether a statement is voluntary include, but are not limited to, whether the defendant received *Miranda* warnings; the defendant's age, intelligence level, education and mental state; the conditions under which the defendant was questioned (i.e., duration,

---

[1] At the suppression hearing, there was also some dispute as to whether Watts was in custody, thereby implicating the requirements of *Miranda v. Arizona*, 384 U.S. 436 (1966). There is no dispute on appeal as to whether Watts was in custody for purposes of *Miranda*. At any rate, the record reflects that the *Miranda* warnings were provided to Watts prior to his statement being taken. *See id*. at 469-70; *see also* Tex. Code Crim. Proc. art. 38.22, §§ 2, 3. Thus, the district court would not have abused its discretion in finding that the statement was admissible on that ground.

environment and access to restroom facilities and food); and whether the defendant was physically punished for failing to provide a statement, such as being deprived of food or sleep. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Oursbourn*, 259 S.W.3d at 172-73.

At the suppression hearing, the district court heard testimony from Watts; Sergeant Mull, the officer who took Watts's statement; and Deputy Chad Miller of the Concho County Sheriff's Office, the officer who had transported Watts to the Runnels County Jail, where the statement was taken. Miller testified that Watts had set up an appointment to take a polygraph examination and that Watts "met me here at the courthouse to fill out paperwork and asked me if I could give him a ride to Ballinger where the examiner was located." Miller explained that Watts was not under arrest or in custody at that time and that Watts wanted to take the polygraph examination. However, Watts had informed Miller "that his vehicle was not running at the time and he needed a ride." During the drive to Ballinger, Miller explained, Watts was in the same clothing he had worn to the courthouse, was not handcuffed in Miller's vehicle, and was riding in the front passenger seat. Once they arrived at the jail, they met with Mull in the lobby area of the jail, and then Miller went elsewhere in the jail while the interview between Mull and Watts took place. Miller returned when Mull took Watts's written statement, and provided a witness signature at the bottom of the statement.

Mull testified that his interview with Watts took place in what Mull identified as the "training room" of the jail. Mull agreed with the prosecutor's statement that the interview "had been arranged as a voluntary meeting" and that Watts was not in handcuffs or in custody during the interview. Mull explained that he had not been involved in the investigation of the case up until that point but was aware of the background of the case. Mull testified that, prior to beginning the

4

interview, he provided Watts with two warning forms. Mull explained, "The first form that we complete is your basic *Miranda* warning. The second form is the polygraph consent form. Both forms indicate that this is a voluntary meeting and that he's free to leave anytime he wants. The polygraph consent advises him who the results will be released to." A copy of what Mull had identified as the "*Miranda* form" was admitted into evidence. The form contained each of the required warnings, including that the person had the right to remain silent; that any statements he made could be used against him in court; that he had a right to have a lawyer present and that, if he could not afford a lawyer, he had a right to be appointed one; and that he had a right to terminate or stop the interview at any time. The initials "BW" appeared next to each warning. Mull identified these initials as belonging to Watts, who goes by the first name "Bill" or "Billy." Also included on the form was the statement, "I knowingly, intelligently, and voluntarily waive those rights set forth in the document." The initials "BW" appeared next to the statement, and what was identified as Watts's signature appeared immediately below the statement. Mull also testified that he had read each of these warnings to Watts, that Watts did not have any questions about the warnings, and that Watts indicated that he understood each warning. According to Mull, he had no trouble communicating with Watts and that Watts spoke the English language, did not appear intoxicated, and did not appear impaired in any way. However, Watts did inform Mull that, although he had graduated from high school, he could only "read a little" and that he "wasn't comfortable writing." To accommodate any difficulties Watts might have had with reading and writing, Mull "completed the statement for him as he told me" and read to Watts what Mull had written.

Mull further testified that, after providing Watts with the *Miranda* warnings, he proceeded to administer a polygraph examination. Then, after the examination was complete, Watts

5

provided his statement. The form on which the statement was written contained the same warnings that Watts had earlier received, and Mull testified that he again explained those warnings to Watts. According to Mull, Watts again indicated that he understood each of the warnings, had no questions about them, and indicated that he wanted to waive his rights and provide a statement. The written statement is three pages long and, at the bottom of each page, Watts provided his signature. Mullen testified that at no point during the interview did Watts indicate that he no longer wanted to continue the interview, ask for a lawyer, or indicate that he did not understand what was going on. When asked to describe how he went about writing the statement for Watts, Mull explained, "It was a directed statement. He had made those statements prior during [sic] the interview, and then when he agreed to give the written statement, I told him that we would go back through his story and, as he told me, I would write it." Mull also testified that, at the conclusion of the statement, he read it in its entirety to Watts, and Watts did not ask to make any changes or adjustments to it. Mull added that at no point did he feel like Watts was disoriented, confused, or having difficulty either understanding Mull or making himself understood.

On cross examination, Watts elicited testimony from Mull concerning the duration of the interview. According to Mull, the *Miranda* warnings were first read to Watts at 1:24 p.m., the polygraph examination began at 2:42 p.m. and ended at 3:27 p.m., and the subsequent interview began at 3:40 p.m. and concluded at 5:23 p.m. Between 3:27 p.m. and 3:40 p.m., Mull testified, he was "scoring the polygraph charts, taking a short break, [and] getting a drink," while Watts "probably went to the lobby." Mull testified that at no point during this time did Watts ask to leave.

Watts, in his testimony, disputed certain aspects of Mull's testimony. For example, Watts testified that, after he had completed the polygraph examination, he told Mull that he wanted

6

to leave, but Mull told him that "he had some other questions that he wanted to ask." Watts also claimed that he was not permitted to leave and that he did not walk out of the interview "because the officer said not to leave." Watts also testified that he noticed that Deputy Miller had a weapon and was wearing his uniform. Watts further denied having read the statement prior to signing it and claimed that he had signed the statement without understanding it. Watts acknowledged that he understood that he had a right to remain silent and not make any statement at all, but he claimed that he was not advised of his other rights. On cross examination, Watts admitted that this was not the first time he had been interviewed by law enforcement,[2] that he read well enough to pass his written driver's test in high school, and that he had a bank account and filed his own income tax return. Watts also admitted that no one had threatened him during the interview and that he had requested the interview with Mull.

On this record, we cannot conclude that the district court abused its discretion in finding that the statement was voluntary. There was disputed testimony as to whether all of the warnings were explained to Watts, whether he understood his rights, whether he asked to leave after the polygraph examination was completed, and whether he understood his statement prior to signing it. However, the district court could have reasonably found Mull's testimony to be credible and Watts's testimony to not be credible, especially in light of Watts's prior experience with law enforcement, and we are to give almost total deference to the district court's credibility determinations at a suppression hearing. Also, there was other evidence at the suppression hearing that was undisputed, including that Watts was not threatened by law enforcement, that he understood

---

[2] Evidence was admitted tending to show that, years earlier, Watts had previously been convicted of the felony offense of injury to a child, specifically his stepdaughter, and had been sentenced to three years' imprisonment for that offense.

that he had a right to remain silent and to not make any statement, that he had requested the interview with Mull, that he had voluntarily accompanied Deputy Miller to the interview, and that he had initialed the warnings and signed each page of the statement. Additionally, the interview itself lasted a total of four hours, and there is no indication in the record that Watts was physically restrained or deprived of any necessities during that time. Based on the totality of the circumstances summarized above, the district court's determination that Watts's statement was voluntary was "reasonably supported by the record" and was not "outside the zone of reasonable disagreement." Accordingly, we cannot conclude that the district court abused its discretion in denying Watts's motion to suppress. We overrule Watts's first issue.

**Motion for continuance**

In his second issue, Watts asserts that the district court abused its discretion in denying his motion for continuance. During Watt's cross-examination of Kathy Sparks, the sexual assault nurse examiner (SANE) in the case, defense counsel learned for the first time that, during Sparks's visual examination of the victim's sexual organ, she had taken photographs of the victim's sexual organ and had reviewed those photographs in preparation for her trial testimony. Sparks acknowledged that she did not furnish copies of these photographs to the District Attorney's Office, nor did she bring copies of them with her to trial. Sparks further testified that the photographs were maintained and kept in a computer at the hospital where she was employed. Upon learning of this information, Watts sought a continuance in order to obtain and examine the photographs. The State opposed the motion, and the district court, after hearing argument from the parties, denied the motion.

8

After trial has begun, a trial court may grant a motion for continuance "when it is made to appear to the satisfaction of the court that by some unexpected occurrence since the trial began, which no reasonable diligence could have anticipated, the applicant is so taken by surprise that a fair trial cannot be had." Tex. Code Crim. Proc. art. 29.13. We review a trial court's ruling on a motion for continuance for abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007); *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996). To establish an abuse of discretion in this context, an appellant must show (1) that the trial court erred by denying his motion for continuance and (2) that he was harmed by the denial of a continuance. *Gonzales v. State*, 304 S.W.3d 838, 843 (Tex. Crim. App. 2010); *Janecka*, 937 S.W.2d at 468. To satisfy the first prong, an appellant must show that "the case made for delay was so convincing that no reasonable trial judge could conclude that scheduling and other considerations as well as fairness to the State outweighed the defendant's interest in delay of the trial." *Gonzalez*, 304 S.W.3d at 843 (quoting George E. Dix & Robert O. Dawson, 42 Tex. Prac. Series: Criminal Practice and Procedure § 28.56 (2d ed. 2001)). To satisfy the second prong, an appellant must show that the trial court's ruling actually prejudiced his defense. *Janecka*, 937 S.W.2d at 468; *Heiselbetz v. State*, 906 S.W.2d 500, 511-12 (Tex. Crim. App. 1995). It is not enough that the appellant was theoretically harmed; rather, a showing must be made on the record that the lack of a continuance denied appellant a fair trial. *See Gonzales*, 304 S.W.3d at 842-43.

On this record, we cannot conclude that the district court abused its discretion in denying the motion for continuance. Pursuant to the district court's discovery order, Sparks was listed as a witness for the State and a copy of her written report was received by defense counsel prior to trial. Thus, the district court could have reasonably concluded that defense counsel had prior

9

notice of Sparks's examination procedures and findings, including that she had visually examined the child's sexual organ, and through reasonable diligence should have anticipated that Sparks might have taken photographs during the examination. Also, the record reflects that most of Sparks's testimony was based on her own observations of the child's sexual organ, not on her review of the photographs. Sparks testified that she had visually observed the victim's hymen to be thin and irregular. In Spark's opinion, this observation was consistent with penetration by a male sexual organ. Sparks testified that she had observed the trauma to the child's hymen even without the use of a colposcope, the device that is used to take pictures of a child's sexual organ. On cross-examination, Sparks admitted that there could be other explanations for the irregular shape of the hymen, such as a congenital defect or self-injury by the victim. Watts was able to elicit these admissions from Sparks even without defense counsel having had an opportunity to review the photographs. Also, Sparks testified that she did not know how many photographs she had taken of the victim's sexual organ, but only on one of the photographs was there any evidence of trauma to the organ. Thus, the district court would not have abused its discretion in finding that the photographs were not so important to the case that, without having access to them, Watts would be denied a fair trial. As the State observed during the hearing, the photographs themselves were "merely cumulative" of Sparks's trial testimony. Additionally, as the district court observed when it was hearing argument on the matter, the photographs were medical records that were in the custody of the hospital and that implicated the victim's privacy concerns, possibly requiring a subpoena to obtain. Thus, the district court could have reasonably concluded that attempting to obtain the photographs would cause a delay in the trial that was not justified by the minimal probative value of the photographs. On this record, Watts has failed to make a showing that not

having access to the photographs made the case for delay "so convincing that no reasonable trial judge could conclude that scheduling and other considerations as well as fairness to the State outweighed the defendant's interest in delay of the trial." Nor has Watts demonstrated on this record how his defense was actually prejudiced by his inability to obtain and review the photographs. We overrule Watts's second issue.

**Evidentiary sufficiency**

In his third issue, Watts asserts that the evidence is insufficient to support the district court's finding of guilt. Specifically, he claims that the State's evidence, including the testimony of the victim, is not credible in light of other evidence in the record.

When reviewing the sufficiency of the evidence to support a conviction, we consider all of the evidence in the light most favorable to the finding of guilt to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virgina*, 443 U.S. 307, 319 (1979). We must consider all the evidence in the record, whether direct or circumstantial or properly or improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the finding, and we defer to the trier of fact's determinations of the witnesses' credibility and the weight to be given their testimony. *Jackson*, 443 U.S. at 318; *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *Clayton*, 235 S.W.3d at 778; *see* Tex. Code Crim. Proc. art. 38.04.

In this case, V.W. testified that, in the summer of 2006, she went with Watts and her brother to the ranch where her father worked. At some point, V.W. recalled, she was separated from her brother and alone with her father when, in V.W.'s words, "He made me pull down my pants."

11

V.W. refused, but her father "pulled them down anyway" and then proceeded to sexually assault her. V.W. testified specifically that Watts put his sexual organ inside her sexual organ and then also "did it from [her] backside," which, V.W. clarified, meant her "bottom." After he was done, V.W. recalled, Watts told her that if she told anyone, "we'd both be in trouble." This scared V.W., and, as a result, she did not tell anyone about the incident until sometime around late December 2007 or early January 2008.

The person to whom V.W. made her initial outcry was her mother, Mary Watts, who was also Watts's wife. Mary testified that V.W. came to her one morning and wanted to talk to her about something but insisted that she could not talk about it. Mary told her, "You can tell me. I'm your mother." Eventually, V.W. "said her daddy touched her" and described to Mary the details of the incident, including that it happened "at the ranch where he worked." Mary then took her daughter to a hospital and informed law enforcement of what had happened.

As discussed above, V.W. was examined by Kathy Sparks, a SANE nurse. Sparks testified that, upon visually examining V.W.'s sexual organ, she observed that the child's hymen was "real thin and irregular," which indicated that "she's had some type of trauma down there." Sparks agreed with the prosecutor that the trauma could be consistent with penetration by a male's sexual organ, although she acknowledged on cross-examination that there could be other explanations, such as a congenital defect or self-injury by the child. Sparks also testified that, when she was interviewing V.W. about what had happened, V.W. had told her, "My Dad did that."

Shortly thereafter, Watts was interviewed by law enforcement. During the interview, as discussed above, law enforcement obtained a written statement from Watts that was admitted into evidence. The statement contained the following:

12

Concerning what [V.W.] says I did to her on one occasion approximately a year-and-a-half ago, while watering at the pens at the ranch outside of Paint Rock, Texas. [V.W.] and I were horse-playing and I accidentally touched her breast. A few minutes later I was sitting inside my pickup and [V.W.] was standing at the open door next to me. I reached over and touched [V.W.] on her breast again. After that I touched [V.W.] on her vagina on the outside of her pants. This touch on her vagina was sexual and my penis was semi hard. I rubbed her vagina for a second and then I pulled my semi-hard penis out of my pants and showed it to [V.W.] and asked her if she wanted to touch it, and she said, yes. [V.W.] then reached and grabbed my penis. [V.W.] held onto my penis for a couple of minutes and then she let go. I put my penis up. Nothing else ever happened between [V.W.] and me. I never had sexual intercourse with [V.W.]

Watts testified in his defense. Watts admitted that he had stated during his interview that he had touched and exposed himself to V.W., but he claimed that he had been lying at the time in order to "lessen the charge" and make law enforcement go easier on him. Watts also claimed that V.W. was lying about what had happened, and Watts denied having intercourse with her. When asked why V.W. would lie about this, Watts testified, "I have no idea," but speculated that she was angry at him because he "wouldn't give her money and go buy stuff like I did her brother." Watts also claimed that "it's a possibility" that Mary had told V.W. to lie because he and Mary were experiencing difficulties in their marriage at the time.

J.W., V.W.'s brother and Watts's son, also testified for the defense. J.W. testified that he did not remember ever being left alone at the ranch while Watts and V.W. went off together, as V.W. had claimed. J.W. further testified that V.W. would get mad at her father on occasion, when her father would buy gifts for J.W.

Viewing the above evidence and all reasonable inferences therefrom in the light most favorable to the district court's finding of guilt, we conclude that the evidence is sufficient to support the district court's finding that Watts had sexually assaulted his daughter. The victim testified that

13

Watts had assaulted her. This testimony, standing alone, would be sufficient to support a finding of guilt. *See Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978) (holding that victim's testimony, standing alone, is sufficient evidence of penetration); *Lee v. State*, 186 S.W.3d 649, 655 (Tex. App.—Dallas 2006, pet. ref'd) ("The testimony of the child victim alone is sufficient to support a conviction for sexual assault."). But in this case, there is more. Specifically, the victim's mother and the sexual assault nurse examiner both testified that V.W. had identified Watts as the person who had assaulted her. Additionally, the SANE nurse testified that V.W. had trauma to her hymen that was consistent with penetration by a male sexual organ. Also, the defendant's statement was admitted into evidence. In that statement, although Watts denied having "intercourse" with V.W., he admitted touching her sexual organ and exposing his sexual organ to her. From this and other evidence, a rational trier of fact could reasonably infer that Watts had gone further than just "touching" V.W. and had in fact penetrated her sexual organ. In his brief, Watts provides alternative explanations for the above evidence and puts forth several reasons why he believes the State's theory of the case is not credible. These defensive theories were argued to the district court at trial, and the district court apparently rejected them, as was its prerogative as the trier of fact. Based on all of the evidence in the record, summarized above, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Watts had committed the offense of aggravated sexual assault of a child as charged. *See, e.g.*, *Martines v. State*, 371 S.W.3d 232, 240 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Shaw v. State*, 329 S.W.3d 645, 657 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd); *Couchman v. State*, 3 S.W.3d 155, 163 (Tex. App.—Fort Worth 1999, pet. ref'd). We overrule Watts's third issue.

**Clerical error in written judgment of conviction**

Finally, we observe that the judgment of conviction contains a clerical error. Specifically, the judgment erroneously states that Watts pleaded "guilty" to the offense. The record reflects that Watts pleaded "not guilty." This Court has the authority to modify incorrect judgments when the necessary information is available to do so. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993); *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992). Accordingly, we modify the judgment of conviction to reflect that Watts pleaded "not guilty" to the charged offense.

## CONCLUSION

As modified, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Rose

Modified and, as Modified, Affirmed

Filed:   August 20, 2013

Do Not Publish

15