**Affirmed and Memorandum Opinion filed August 8, 2023.**



In The

# Fourteenth Court of Appeals

## NO. 14-22-00443-CR

**TERRANCE GLENN MOSLEY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 184th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1716218**

## MEMORANDUM OPINION

Appellant Terrance Glenn Mosley appeals his conviction for aggravated robbery. In one issue he contends the trial court erred in admitting autopsy photographs. We affirm.

Appellant contends the trial court erred in admitting eight photographs taken during the autopsy of the complainant. Appellant contends that the photographs were unnecessary because appellant did not dispute that he assaulted the complainant or that the complainant's head injury caused his death. Appellant contends that the autopsy photos were "extremely graphic and unfairly prejudiced [appellant's] case."

## A.    General Legal Principles

A trial court has considerable discretion when ruling on the admissibility of photographs, *see Huffman v. State*, 746 S.W.2d 212, 222 (Tex. Crim. App. 1988), and under Rule 403, *Winegarner v. State*, 235 S.W.3d 787, 791 (Tex. Crim. App. 2007). "Generally, a photograph is admissible if verbal testimony as to matters depicted in the photographs is also admissible." *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). "[I]f verbal testimony is relevant, photographs of the same are also relevant." *Id*. "A visual image of the injuries appellant inflicted on the victim is evidence that is relevant to the jury's determination." *Id*. "The fact that the jury also heard testimony regarding the injuries depicted does not reduce the relevance of the visual depiction." *Id*.

Rule 403 allows for the exclusion of relevant evidence if its probative value is "substantially outweighed by the danger of unfair prejudice." Tex. R. Evid. 403. "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Gallo*, 239 S.W.3d at 762. "A court may consider several factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice." *Williams v. State*, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997). In conducting a Rule 403 analysis we review the following non-exhaustive factors:

(1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004). In the context of the admission of photographs, we also consider additional, non-exhaustive factors including: (1) the number of photographs, (2) the size; (3) whether they are in color or are black and white; (4) whether they are gruesome; (5) whether any bodies are clothed or naked; and (6) whether the body has been altered by autopsy. *Id.*

A person commits the offense of aggravated robbery "if he commits robbery . . . and he (1) causes serious bodily injury to another." Tex. Penal Code § 29.03. "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." Tex. Penal Code § 1.07(46).

## B.     Background

Appellant was indicted and charged with aggravated robbery of Hiram Anthony Moss. The indictment alleged that in the course of committing theft of Moss's property and with intent to obtain and maintain control of the property, appellant "intentionally, knowingly and recklessly cause[d] serious bodily injury to Hiram Anthony Moss, by striking the complainant with his hand and pulling him to the ground with his hand and causing the complainant's head to strike the ground."

In opening statements, appellant stated that:

> the evidence is also going to show that people observed and
> documented that [Moss] walked away from this alleged incident.
> Walked away. So I respectfully disagree, and the evidence is going to

3

show that the statement made by the prosecutor that [Moss] was unconscious from the point of the incident until his passing, I respectfully . . . disagree. The evidence is not going to show that. The evidence is going to show that he walked away.

Appellant testified that he approached Moss at a convenience store. Appellant testified that he had known Moss for about a year-and-a-half, and they were "close" friends. Appellant also testified that Moss owed him some money. In the convenience store appellant confronted Moss and Moss threw him ten dollars.[1] Moss made a purchase in the store and went to leave. Appellant spit at Moss and then followed him outside to the parking lot. Appellant testified that once outside Moss pulled a knife out of his pocket and made a slashing motion at appellant.[2] Appellant testified that Moss cut his left forearm twice with the knife and then turned and walked to his truck. Appellant testified that he followed Moss because he wanted to know why Moss had cut him. Appellant testified that he was still talking about the money Moss owed him while confronting Moss at the truck in the parking lot.

The convenience store surveillance video of the parking lot shows Moss walking slowly toward the passenger side of the truck[3] he arrived in, bracing himself along the vehicle as he walks toward the passenger-side door. Appellant is following close behind at a quicker pace. Moss grabs the passenger-side door handle as appellant hits Moss on the right side of his face and head twice.

---

[1] An officer viewing the video surveillance footage from inside the convenience store testified that Moss handed Appellant the money, but Appellant "snatched" it from Moss's hand, resulting in the bill dropping to the ground.

[2] The State and Appellant do not dispute that there was a portion of the outside of the convenience store that was not captured by cameras. The timestamp on the videos in evidence established that twenty seconds passed between Appellant's exit from the store until Moss's appearance on the outside surveillance camera.

[3] The witnesses classified the vehicle as a "truck;" we use the same terminology when describing the vehicle.

Appellant then passes around behind Moss and hits him again on the left side of the head.  Appellant then grabs Moss by the back of his shirt collar and forcefully throws him to the concrete pavement.  Moss barely attempts to lift an arm to defend himself against being hit and topples to the ground without bracing himself.  After being thrown to the ground, Moss appears unconscious as he does not attempt to get up and does not move.  Appellant bends down over Moss and removes items from both of Moss's front pockets. Appellant takes the items removed from Moss's pockets and returns to the convenience store.

Appellant testified that after he was cut with the knife, he did not see the knife in Moss's hand and did not see Moss put it away;  appellant admitted that when Moss was by the vehicle Moss did not have the knife:

> Q. [State] So, Mr. Mosley, what you are telling this jury is that you don't know where the knife is, but you know for sure that at this point it's not with Mr. Moss?
>
> A. Yes.
>
> Q. And you still attack him?
>
> A. Yes.
>
> Q. Even though he was unarmed at the time?
>
> A.  At the time, yes.
>
> Q. Okay. So you punch him a few times.  Did he ever turn around to face you?
>
> A. No sir.
>
> Q. Okay. So you punched him again on the other side and he is still not turned around to face you; is that right?
>
> A. Correct.
>
> Q. Okay.  In fact, he is trying to get away, get inside the car, is that not true?
>
> A. Correct.
>
> . . .

5

Q. Okay. At any point do we see a knife fall off of him?

A. No, sir.

Appellant also testified that he did not take a knife out of Moss's pockets.

When emergency responders arrived, Moss was awake and responsive. Body camera video from a responding officer was admitted into evidence and depicts Moss talking with officers and emergency medical services. In the video Moss repeatedly says "I'll be alright" to the responders[4] and declined to go to the hospital by ambulance. Moss had difficulty answering many of the questions asked by the officers and emergency responders. The officer testified that Moss's speech was "very slurred" and, when the officer arrived, Moss was being held up by two women. On cross-examination, the officer admitted that he did not know Moss, had never heard him talk prior to this incident, and would not have known if his manner of speaking on that night was different than his normal speech. The officer also admitted neither he nor anyone else asked Moss to stand up by himself, so it was not clear whether Moss could or could not stand without support.

The following day Moss's family took him to the hospital. Moss underwent surgery to relieve pressure from brain swelling. Moss never regained consciousness and died approximately six months later.

The medical examiner testified regarding Moss's physical injuries from the robbery. The medical examiner testified that she conducted the autopsy on Moss. She testified that Moss's cause of death was "complications of blunt impact injuries of the head." The medical examiner's autopsy report was admitted into evidence. The autopsy report describes the injury to Moss's head and brain in medical terminology:

---

[4] An officer testified that he believed Moss said this phrase at least twenty times during his encounter.

There is a concave deformity of the left side of the head. There is a plastic catheter extending from a craniotomy defect in the right frontal bone (ventriculoperitoneal shunt); and a left craniotomy covered with a fibrous patch, with transcalvarial herniation on the left cerebral hemisphere. . . . There are remote cerebral cortical contusions of the orbital surfaces of the bilateral frontal lobes, and left temporal lobe; and a remote subdural hemorrhage adherent to the bilateral posterior cranial fossae, and let middle and anterior cranial fossae.

The State sought to admit ten photographs taken during the autopsy depicting the injury to Moss's brain. Appellant objected to nine of the photographs on the grounds that they were not probative because the testimony already established that Moss died from complications due to his head injury. Appellant argued that the photos were highly prejudicial and would only "serve to inflame the passions of the jury." The State contended that the photos were necessary to prove serious bodily injury as an element of aggravated robbery. The trial court excluded one of the photos but admitted the remaining eight photos over appellant's objection.

The medical examiner testified about what was depicted in the autopsy photos. Exhibit nine, admitted without objection, depicts Moss's face. The photo shows an indention in Moss's skull on the left side of his head. The medical examiner testified that Moss had undergone surgery and removal of part of the left side of his skull. Exhibit eighteen is a photograph of Moss's brain after being removed from his skull. The medical examiner testified that she removed the brain from the skull as part of the autopsy and that the brain should be "completely symmetrical." The medical examiner testified regarding exhibit eighteen that the left side of Moss's brain was "bulging" outward. The medical examiner testified that the picture depicted a hemorrhage with sufficient bleeding to push Moss's brain "from the left side of his skull to the right side of his skull." She testified this type of injury is serious and life threatening and without medical intervention there is a high risk and high rate of mortality.

The medical examiner testified briefly about exhibits eleven, thirteen, fourteen, and fifteen. She testified about how she had made incisions in Moss's scalp to access his skull and brain for the autopsy. She explained the injuries depicted in the photographs, such as the portion of skull that was removed during surgery to relieve pressure on Moss's brain. Exhibit fifteen depicts the inside of Moss's skull after his brain was removed. The medical examiner testified that the brown stained portions of the skull reflected the hemorrhage where the blood had collected around the outside of the brain, most prominently on the left side of his head. Exhibit sixteen depicts Moss's brain from a different angle to show the difference in color to the back portion of the brain as "a result of this prior bleeding that had occurred." Exhibit seventeen depicts Moss's temporal lobe with "brown discoloration and softening." The medical examiner testified that this picture illustrated that the brain was bruised and had undergone some healing. The medical examiner further testified in detail about the many complications Moss experienced as a result of his brain injury, which ultimately resulted in Moss's death approximately six months later.

In the State's brief closing, the State mentioned that the medical examiner testified about the damage caused to Moss's brain from being pulled to the ground. The remainder of the State's closing argument was dedicated to refuting appellant's self-defense theory.

## C.    Analysis

Appellant argues that the autopsy photos were "extremely graphic and unfairly prejudiced" his case. Appellant contends that he did not dispute at trial that he caused Moss's head injury and that the head injury ultimately resulted in Moss's death. He contends that because this fact was undisputed, the probative

8

value of the photos was minimal and was "strongly outweighed by their gruesomeness."

**(1)        Probative Value of the Photographs**

The autopsy photos were offered to prove an element of the crime appellant was charged with—namely serious bodily injury.  The photographs showed the extent and quality of the injury Moss suffered at the hands of appellant.  Appellant admits that this factor weighs in favor of admission.

**(2)        Potential to Impress the Jury**

Appellant argues that the photos are incredibly graphic because they "showed a prominent depression in [Moss's] skull caused not by [appellant] but by the removal of a portion of [Moss's] skull during surgery."  However, the photograph that shows the depression, exhibit nine, is the photograph that appellant did not object to.  The medical examiner also explained to the jury that a portion of Moss's skull had been removed to relieve the pressure caused by his brain swelling.

Regarding the other photographs, the medical examiner explained how and why she had to cut into Moss's scalp and remove it to access his skull and brain to examine it and the extent of the injury as part of her autopsy examination and report.  Thus, while the images were graphic and possibly disturbing to the jury, there was no risk or danger of the jury attributing the portion of missing skull or cuts in Moss's scalp to injury caused by appellant.  *See Gallo*, 239 S.W.3d at 763 ("Although these photographs are gruesome, there was no danger that the jury would attribute the removal of the rib, scalp, or skull cap to the defendant."). Instead, the photographs were visual images of the medical descriptions provided by the medical examiner in her oral testimony and autopsy report.  *See*

9

*Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999) ("Visual evidence accompanying testimony is most persuasive and often gives the fact finder a point of comparison against which to test the credibility of a witness and the validity of his conclusions."). The autopsy photographs showed the injuries to Moss that could not be seen on the surface of the body. *See Gallo*, 239 S.W.3d at 763.

This factor weighs in favor of admission.

### (3) Time Needed to Develop the Evidence

The medical examiner was the only witness who testified about the photographs and the injuries depicted therein. Appellant contends that the State "elicited detailed and lengthy testimony" and that altogether the medical examiner's testimony about the photographs spanned eleven pages or approximately twenty-five percent of her entire direct examination. The State questioned the medical examiner about each photo and how that photo depicted an injury caused by appellant throwing Moss to the ground. None of the other four witnesses called by the State testified regarding the objected-to photographs.[5] The time spent by the State in developing evidence of an essential element of the crime was not exorbitant and the State did not needlessly linger on the photographs. Instead, much of the State's case was focused on refuting appellant's self-defense theory. We disagree with appellant's contention that the State elicited "detailed and lengthy testimony" here.

This factor weighs in favor of admission.

---

[5] We note that Moss's brother testified that Moss was the individual depicted in exhibit nine. Appellant did not object to the admission of exhibit nine.

### (4)        The State's Need for the Evidence

Appellant contends the State had ample other evidence to prove he caused Moss serious bodily injury such as: (1) the surveillance camera footage; (2) the police body camera footage; (3) Moss's brother's testimony that Moss's speech on the body camera footage was abnormal; (4) the autopsy report; and (5) the medical examiner's testimony about Moss's admission to the hospital and the serious and life-threatening complications he suffered as a result of the injury. Appellant further contends that he did not dispute causing the head injury or that it was a serious bodily injury resulting in Moss's death.

In opening statements, appellant contended that the evidence would show that Moss "walked away" from the incident. Appellant also questioned whether the officer's testimony regarding Moss's speech as "slurred" was accurate as the officer had never heard Moss speak before. Appellant questioned whether Moss could actually stand on his own accord after the incident because no one asked him to stand during the body camera video. Later, Moss's brother testified that Moss's speech in the body camera video was abnormal. Thus, appellant did question the severity of the injury caused to Moss as portrayed in the body camera video.

The surveillance camera footage of the incident portrays the violence of the incident, but not the extent of the injury to Moss. In this video it appears that Moss is unconscious after he is thrown to the ground because he does not move, but his face cannot be seen. By the end of the video, it is unclear whether Moss is still unconscious because he is still lying on the ground but his left foot moves. Other individuals appear to be talking to Moss or possibly to each other, but it is unclear whether Moss is responsive. There is no audio to the video and none of the other individuals depicted in the video testified. At the end of this video, Moss is still lying on the ground.

11

Moss's brother's testimony regarding his brother's speech was brief. He indicated that in the body camera video Moss was not talking as he usually did. This also does not portray the severity of the injury to Moss caused by being thrown to the pavement.

The autopsy report, as detailed above, offers a medical explanation of the injuries suffered by Moss and the complications that arose thereafter. Given the report's extensive use of medical terminology, it is unlikely the jury would have truly understood the extent of Moss's injury and how serious it was without additional testimony from the medical examiner and the visual aids of the photographs. *See Chamberlain*, 998 S.W.2d at 237 ("The photographs are gruesome in that they depict disagreeable realities, but they depict nothing more than the reality of the brutal crime committed."); *see also Harris v. State*, 661 S.W.2d 106, 108 (Tex. Crim. App. 1983) ("The photograph [of the victim's skull] illustrated and clarified Dr. Hall's description of the injuries, and no error is reflected in its admission.").

Lastly, while the medical examiner's testimony about the complications arising from the head injury were relevant to show the extent of Moss's injury, the testimony and photographs conveyed the actual injury suffered. Exhibit nine shows the indentation to Moss's skull from the removal of a portion of his skull to relieve pressure. However, the photograph of Moss is otherwise unremarkable—it does not convey the extent of the internal injury suffered by Moss from the incident. The only portrayal of such injury is through the photographs and testimony of the medical examiner explaining how a normal, uninjured skull and brain appear in comparison to Moss's skull and brain. *See Gallo*, 239 S.W.3d at 762 ("A visual image of the injuries appellant inflicted on the victim is evidence that is relevant to the jury's determination. The fact that the jury also heard

12

testimony regarding the injuries depicted does not reduce the relevance of the visual depiction.").

Further, there is no formal stipulation in the record. When the State rested its case, appellant moved for an instructed verdict arguing "we don't believe the State has met the elements." Appellant argues that the evidence of serious bodily injury was not "disputed" because he did not object to the admission of the autopsy report or "question [the medical examiner's] findings" during cross-examination. However, he did challenge whether the State had met all of the elements of aggravated robbery, including serious bodily injury.

This factor weighs in favor of admission.

### (5) The Number of Photographs, Size, Color and Gruesomeness

Each photograph depicts the extent of the injury appellant inflicted upon Moss. As provided by the testimony of the medical examiner, the photographs of the inside of the skull (without the brain) demonstrate the extent of the bleeding that occurred around the brain. The photographs of the brain showed the bleeding that occurred on the brain, the healing that occurred to a portion of the brain, and the extent of the swelling that occurred. Thus, each photograph conveyed a different portion of the injury inflicted as explained by the testimony of the medical examiner. Taken together, the photographs demonstrate an essential element of the State's case against appellant.

The photos were approximately 8.5" x 11" or about the same size as a sheet of paper. The photographs were in color. It appears that color was necessary to distinguish the areas the medical examiner described as depicting the bleeding that occurred from the areas where bleeding did not occur—noting the brownish-red

discoloration to the skull and brain as opposed to the "shiny white" of the other undamaged portions of the skull and the otherwise undamaged areas of the brain.

Appellant contends that these eight exhibits made up about half of all the exhibits offered by the State and admitted by the trial court.[6]  However, the State only discussed these photos with the medical examiner and did not otherwise draw the jury's attention to them.  Instead, the State focused extensively on the surveillance and body camera videos in its case-in-chief.  While the photos made up about half of all the exhibits, this does not portray how such exhibits were used in trial.  We agree the photographs are gruesome and graphic, but no more so than necessary to show the extent and nature of the injury to Moss.  *See Gallo*, 239 S.W.3d at 763 ("The medical examiner used the photographs to show the massive amount of damage that was inflicted on the victim before her death.").

These factors weigh in favor of admission.

**(6)        Whether the Body is Clothed or Naked**

Only Moss's head is shown in the photographs.  Thus, the jury was not shown photographs of Moss's naked body.  This factor weighs in favor of admission.

**(7)        Whether the Body has Been Altered by Autopsy**

Moss's head was altered by the autopsy—his brain was removed from his skull; his scalp was cut open and "folded" over his face.  We agree that this factor weighs against admission.

---

[6] The State offered and the trial court admitted eighteen exhibits into evidence.

**D.     Conclusion**

Weighing all the factors, we cannot conclude the trial court abused its discretion in admitting the autopsy photographs.

**HARM**

Even if we concluded that the trial court abused its discretion in admitting the photographs, after review of the entire record we would conclude we have fair assurance the error did not influence the jury or but had a slight effect. *See* Tex. R. App. P. 44.2(b); *see also Reese v. State*, 33 S.W.3d 238, 243 (Tex. Crim. App. 2000); *Rolle v. State*, 367 S.W.3d 746, 752 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd).

Appellant testified that he was acting in self-defense when he hit Moss and threw him to the ground. His entire defensive theory was that Moss attacked him, off-camera, with a knife. The State's witnesses agreed that there was a "blind-spot" and that Moss and appellant were in that blind-spot for approximately twenty seconds according to the timestamps on the surveillance videos from both inside and outside of the convenience store. However, appellant testified and admitted that at the time that he hit Moss and threw him to the ground, Moss did not have a knife and was not acting aggressively. Appellant agreed that Moss was retreating to his vehicle when appellant attacked him. Appellant admitted to being angry with Moss at the time. Appellant's testimony and the surveillance camera footage of the attack are powerful evidence of appellant's guilt.

The State only discussed the autopsy photos during the medical examiner's testimony and referenced them once during closing argument. In other words, once the State had proven up serious bodily injury through these photographs, the State returned to refuting appellant's self-defense theory. As mentioned, the

15

surveillance video footage was referenced repeatedly and discussed with multiple witnesses in the State's case-in-chief.

In closing, the State emphasized and asked the jury to focus on the law of self-defense first. The State recalled that all of the video evidence showed appellant as the aggressor with Moss trying to retreat and none of the video evidence ever showed Moss as the aggressor. The State emphasized that only in the blind spot did appellant allege that Moss ever became aggressive, and that appellant's testimony was not credible. The State highlighted inconsistencies in appellant's testimony. With regard to serious bodily injury, the State argued during closing that this element was shown from the video of Moss being pulled to the ground and striking his head on the concrete. The State alluded to the autopsy photographs stating "[a]nd then we heard from [the medical examiner] about the damage that caused to his brain. All of the inflammation, the internal bleeding, right on the same spot that we see [Moss's] head strike the ground, when [appellant] recklessly pulled an elderly man to the ground." The State then concluded by again recounting what the surveillance videos showed and that even if the jury were to believe that Moss brandished a knife and cut appellant, appellant's actions thereafter did not comport with the law of self-defense and was not justified.

The State did not send the jury to its deliberations thinking about the photographs. *See Reese*, 33 S.W.3d at 244 (concluding State emphasized erroneous photo by referencing it just before concluding its closing and, therefore, court could not be assured that the erroneous photo did not influence the jury or had but a slight effect). Here, the State repeatedly emphasized and implored the jury to consider the video evidence and appellant's own admissions that Moss was not an immediate threat and was, in fact, retreating when appellant attacked him.

16

Thus, we conclude that we have fair assurance the error, if any, did not influence the jury or but had a slight effect.

## CONCLUSION

Reviewing and weighing all of the factors, we cannot conclude the trial court abuse its discretion in admitting the autopsy photographs. We further conclude that even if it was error, such error was harmless. We overrule appellant's sole issue and affirm the judgment of the trial court.


/s/     Ken Wise
        Justice


Panel consists of Justices Wise, Zimmerer, and Wilson.

Do Not Publish — TEX. R. APP. P. 47.2(b).

17